**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

2019 JUN 17 A 9 12

US DISTRICT COURT
BRIDGEPORT CT

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**GRAND TETON PROFESSIONALS, LLC,** *et al.,*

Defendants.

**FILED UNDER SEAL**

Case No.  3:19 cv 933 - VAB

June 17, 2019

**MEMORANDUM IN SUPPORT OF THE FTC'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

i

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.    THE PARTIES................................................................................................2

     A.     Federal Trade Commission ................................................................2

     B.     Defendants ................................................................................3

III.    DEFENDANTS' UNLAWFUL BUSINESS PRACTICES ................................8

     A.     Defendants' Unlawful Credit Repair Services Practices ................8

          1.     Defendants Make False Promises Regarding Their Credit Repair Services ................................................................8

                 a.     Defendants Make False Promises about Removing Negative Items and Hard Inquiries to Improve Consumers' Credit Scores ................................9

                 b.     Defendants Make False Promises about Adding Tradelines to Consumers' Credit Reports to Improve Consumers' Credit Scores ................................16

          2.     Defendants Advise Consumers To Make False Statements ................19

                 a.     Defendants Advise Consumers To File False ID Theft Affidavits ................................20

                 b.     Defendants Advise Consumers To Mislead Creditors................21

          3.     Defendants Fail to Make Required CROA Disclosures and Provide Consumers with Written Contracts................23

          4.     Defendants Illegally Collect Advance Fees for Credit Repair Services ................................25

     B.     Defendants' Unfair and Unlawful Use of Anti-Disparagement and Anti-Chargeback Provisions................27

          1.     Defendants' Anti-Disparagement Provision is Unfair and Violates the CRFA ................................25

          2.     Defendants' Anti-Chargeback Provision is Unfair................32

     C.     Defendants' Unlawful Financing and Billing Practices................35

          1.     Defendants' Unlawful Use of Remotely Created Checks................36

          2.     Defendants Fail to Disclose Annual Percentage Rate................36

|  |  | 3. | Defendants Fail to Obtain Written Authorization for Recurring Electronic Fund Transfers | 37 |
|  | D. | | Consumer Injury | 38 |
| IV. | | | A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS | 38 |
|  | A. | | This Court Has the Authority to Grant the Requested Relief | 38 |
|  | B. | | The FTC Meets the Standard for Granting a Government Agency's Request for Preliminary Injunctive Relief | 39 |
|  |  | 1. | The FTC Has Demonstrated Its Likelihood of Success on the Merits | 40 |
|  |  | 2. | The Equities Weigh in Favor of Granting Injunctive Relief | 41 |
|  | C. | | Defendants Are a Common Enterprise and Jointly and Severally Liable for the Law Violations | 42 |
|  | D. | | The Individual Defendants Are Liable for Injunctive and Equitable Monetary Relief | 43 |
| V. | | | THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT | 45 |
|  | A. | | Conduct Relief | 45 |
|  | B. | | An Asset Preservation Order Is Necessary to Preserve the Possibility of Final Effective Relief | 45 |
|  | C. | | Temporarily Disabling Websites | 48 |
|  | D. | | Preservation of Records | 48 |
|  | E. | | Expedited Discovery, Including Immediate Production of Documents | 49 |
|  | F. | | The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to Fashion Meaningful Relief | 49 |
| VI. | | | CONCLUSION | 50 |

# TABLE OF AUTHORITIES

## REPORTED CASES

*AT&T Broadband v. Tech Commc'ns.,*
  381 F.3d 1309 (11th Cir. 2004) ....................................................................50

*Benham Jewelry Corp. v. Aron Basha Corp.,*
  1997 U.S. Dist. LEXIS 15957 (S.D.N.Y. July 18, 1997) ...............................49

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.,*
  657 F. Supp. 867 (D. Nev. 1987).....................................................................50

*CFTC v. British Am. Commodity Options Corp.,*
  560 F.2d 135 (2d Cir. 1977)......................................................................40, 42

*CFTC v. Hunt,*
  591 F.2d 1211 (7th Cir. 1979) ........................................................................42

*City of New York v. Golden Feather Smoke Shop, Inc.,*
  597 F.3d 115 (2d Cir. 2010).......................................................................39, 40

*Deckert v. Independence Shares Corp.,*
  311 U.S. 282 (1940).................................................................................46, 48

*Del. Watch Co. v. FTC,*
  332 F.2d 745 (2d Cir. 1964).......................................................................42, 43

*English v. Gen. Elec. Co.,*
  496 U.S. 72 (1990)..........................................................................................27

*Fed. Express Corp. v. Fed. Expresso, Inc.,*
  1997 U.S. Dist. LEXIS 19144 (N.D.N.Y. Nov. 24, 1997) ..............................49

*FTC v. 4 Star Resolution, LLC,*
  2015 WL 7431404 (W.D.N.Y. Nov. 23, 2015) ...............................................40

*FTC v. Accusearch Inc.,*
  2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sep. 28, 2007) .................................28

*FTC v. Affordable Media, LLC,*
  179 F.3d 1228 (9th Cir. 1999) ..................................................................44, 47

*FTC v. BlueHippo Funding, LLC,*
  762 F.3d 238 (2d Cir. 2014).............................................................................8

*FTC v. Bronson Partners, LLC,*
  654 F.3d 359 (2d Cir. 2011)................................................................3, 39, 45

*FTC v. Bronson Partners, LLC,*
  564 F. Supp. 2d 119 (D. Conn. 2008)...........................................................8

*FTC v. Campbell Capital LLC,*
  2018 U.S. Dist. LEXIS 186728 (W.D.N.Y. Oct. 24, 2018)........................42, 49

*FTC v. Consumer Health Benefits Ass'n,*
  2011 U.S. Dist. LEXIS 92389 (E.D.N.Y. Aug. 18, 2011)...............................43

*FTC v. Crescent Publ'g Group,*
  129 F. Supp. 2d 311 (S.D.N.Y. 2001).......................................................40, 41

*FTC v. D Squared Sols., LLC,*
  2003 WL 22881377 (D. Md. Oct. 30, 2003) ................................................47

*FTC v. Direct Mktg. Concepts, Inc.,*
  624 F.3d 1 (1st Cir. 2010).........................................................................10

*FTC v. Five-Star Auto Club,*
  97 F. Supp. 2d 502 (S.D.N.Y. 2000)........................................................8, 41

*FTC v. Gill,*
  265 F.3d 944 (9th Cir. 2001) ..................................................................10, 25

*FTC v. H.N. Singer, Inc.,*
  668 F.2d 1107 (9th Cir. 1982) ....................................................................38

*FTC v. IAB Mktg.,*
  746 F.3d 1228 (11th Cir. 2014) ..................................................................46

*FTC v. Instant Response Sys., LLC,*
  2015 WL 1650914 (E.D.N.Y. Apr. 14, 2015) ...............................................8

*FTC v. John Beck Amazing Profits, LLC,*
  865 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................................42

*FTC v. Lancaster Colony Corp.,*
  434 F. Supp. 1088 (S.D.N.Y. 1977)..............................................................40

*FTC v. LeadClick Media, LLC,*
  838 F.3d 158 (2d Cir. 2016)....................................................................43, 44

*FTC v. LeanSpa, LLC,*
    2015 U.S. Dist. LEXIS 26906 (D. Conn. Mar. 5, 2015)...........................................8, 39, 44

*FTC v. LeanSpa, LLC,*
    920 F. Supp. 2d. 270 (D. Conn. 2013)...............................................................44

*FTC v. Mallett,*
    818 F. Supp. 2d 142 (D.D.C. 2011)..............................................................40, 41

*FTC v. Moses,*
    913 F.3d 297 (2d Cir. 2019)........................................................................43, 44

*FTC v. Nat'l Urological Group, Inc.,*
    645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd* 356 Fed. Appx. 358
    (11th Cir. 2009).......................................................................................44

*FTC v. Neovi, Inc.,*
    604 F.3d 1150 (9th Cir. 2010) ........................................................................28

*FTC v. OMICS Grp. Inc.,*
    2017 U.S. Dist. LEXIS 161910 (D. Nev. Sep. 29, 2017) ...................................10

*FTC v. Primary Grp., Inc.,*
    713 F. App'x 805 (11th Cir. 2017) ..................................................................44

*FTC v. Publ'g Clearing House, Inc.,*
    104 F.3d 1168 (9th Cir. 1997) ........................................................................43

*FTC v. RCA Credit Servs., LLC,*
    727 F. Supp. 2d 1320 (M.D. Fla. 2010)...........................................................10

*FTC v. Ross,*
    897 F. Supp. 2d 369 (D. Md. 2012) ............................................................45, 46

*FTC v. Stefanchik,*
    559 F.3d 924 (9th Cir. 2009) ...........................................................................8

*FTC v. Sterling Drug, Inc.,*
    317 F.2d 669 (2d Cir. 1963)............................................................................8

*FTC v. Strano,*
    528 F. App'x 47 (2d Cir. 2013) ......................................................................46

*FTC v. Think Achievement Corp.,*
    144 F. Supp. 2d 993 (N.D. Ind. 2000) .............................................................42

*FTC v. Univ. Health, Inc.*,
   938 F.2d 1206 (11th Cir. 1991) ........................................................40

*FTC v. USA Fin., LLC*,
   415 Fed. Appx. 970 (11th Cir. Feb. 25, 2011).................................44

*FTC v. U.S. Oil & Gas Corp.*,
   748 F.2d 1431 (11th Cir. 1984) ........................................................39

*FTC v. Verity Int'l Ltd.*,
   443 F.3d 48 (2d Cir. 2006).........................................................8, 10

*FTC v. Verity Int'l Ltd.*,
   335 F. Supp. 2d 479 (S.D.N.Y. 2004)........................................27, 28

*FTC v. Verity Int'l Ltd.*,
   124 F. Supp. 2d 193 (S.D.N.Y. 2000)................................40, 41, 46

*FTC v. Windward Mktg. Ltd.*,
   1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sep. 30, 1997) ............28, 44

*FTC v. World Travel Vacation Brokers*,
   861 F.2d 1020 (7th Cir. 1988) ....................................................10, 45

*FTC v. World Wide Factors, Ltd.*,
   882 F.2d 344 (9th Cir. 1989) ......................................................40, 42

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)..............................................................46

*In re Int'l Harvester*,
   104 F.T.C. 949 (1984)........................................................................28

*Kraft, Inc. v. FTC*,
   970 F.2d 311 (7th Cir. 1992) ..............................................................8

*LeBlanc v. Unifund CCR Partners*,
   601 F.3d 1185 (11th Cir. 2010) ..........................................................7

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010).................................................................40

*Nat'l Soc'y of Prof. Eng'rs. v. United States*,
   435 U.S. 679 (1978)...........................................................................42

*Orkin Exterminating Co. v. FTC,*
    849 F.2d 1354 (11th Cir. 1988) ...........................................................28

*PLIVA, Inc. v Mensing,*
    564 U.S. 604 (2011) ...........................................................................27

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ...........................................................................49

*Rannis v. Fair Credit Lawyers, Inc.,*
    489 F. Supp. 2d 1110 (C.D. Cal. 2007) ...............................................27

*Removatron Int'l Corp. v. FTC,*
    884 F.2d 1489 (1st Cir. 1989) .............................................................10

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) .............................................................47

*SEC v. Prater,*
    289 F. Supp. 2d 39 (D. Conn. 2003) ...................................................41

*SEC v. R.J. Allen & Assoc., Inc.,*
    386 F. Supp. 866 (S.D. Fla. 1974) .................................................41, 42

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) .............................................................48

*In re Southwest Sunsites, Inc.,*
    105 F.T.C. 7 (1985), aff'd, 785 F.2d 1431 (9th Cir. 1986)....................8

*Trudeau v. FTC,*
    384 F. Supp. 2d 281 (D.C. Cir. 2005)..................................................22

*United States v. Diapulse Corp. of Am.,*
    457 F.2d 25 (2d Cir. 1972)............................................................39, 42

*United States v. First Nat'l City Bank,*
    379 U.S. 378 (1965)...........................................................................46

*United States v. Sun & Sand Imports, Ltd., Inc.,*
    725 F.2d 184 (2d Cir. 1984)...............................................................40

*In re Vuitton et Fils, S.A.,*
    606 F.2d 1 (2d. Cir. 1979)..................................................................50

# UNREPORTED CASES

*FTC et al. v. Campbell Capital LLC*,
     Case No. 1:18-cv-01163-LJV-MJR (W.D.N.Y. Oct. 25, 2018) ...................................39, 46

*FTC v. Capital Enterprises, Inc.*,
     Case No. 1:15-cv-08407-ER (S.D.N.Y. Oct. 26, 2015)..............................................46, 48

*FTC v. Consumer Health Benefits Assoc.*,
     Case No. 1:10-cv-03551-ILG (E.D.N.Y. Aug. 3, 2010)..............................................39, 46

*FTC v. Global U.S. Resources*,
     Case No. 3:10-cv-01457-VLB (D. Conn. Sep. 14, 2010)...........................................39, 46

*FTC v. Int'l Direct, Inc.*,
     Case No. 3:97-cv-00721-PCD (D. Conn. Apr. 16, 1997)...........................................39, 46

*FTC et al. v. Leanspa, LLC*,
     Case No. 3:11-cv-01715-JCH (D. Conn. Nov. 14, 2011)...........................................39, 46

*FTC v. Marczak*,
     Case No. 1:12-cv-07192-PAE (S.D.N.Y. Sep. 25, 2012)...........................................39, 48

*FTC v. Mortgage Service Assoc., Inc.*,
     Case No. 3:95-cv-01362-AVC (D. Conn. Jul. 13, 1995)......................................................39

FTC *v. Pairsys, Inc.*,
     Case No. 1:14-cv-01192-TJM-CFH (N.D.N.Y. Sep. 30, 2014) ...........................39, 46, 48

*FTC v. PCCare247 Inc.*,
     Case No. 1:12-cv-07189-PAE (S.D.N.Y. Sep. 25, 2012)...................................................48

*FTC v. Pecon Software Ltd.*,
     Case No. 1:12-cv-07186-PAE (S.D.N.Y. Sep. 25, 2012)...................................................48

*FTC v. Zeal IT Solutions Pvt Ltd.*,
     Case No. 1:12-cv-07188-PAE (S.D.N.Y. Sep. 25, 2012)...................................................48

# STATUTES

15 U.S.C. §§ 41–58......................................................................................................................2

15 U.S.C. § 45 ..........................................................................................................................1, 8

15 U.S.C. § 45(a) .............................................................................................................2, 27

15 U.S.C. § 45(n) ................................................................................................................27

15 U.S.C. § 45b ...........................................................................................................1, 2, 31

15 U.S.C. § 45b(a)(2) ..........................................................................................................31

15 U.S.C. § 45b(a)(3) ..........................................................................................................31

15 U.S.C. § 45b(b)(1) ..........................................................................................................31

15 U.S.C. § 45b(c) ...............................................................................................................31

15 U.S.C. § 45b(d) .................................................................................................................2

15 U.S.C. § 53(b) ...........................................................................................................1, 38

15 U.S.C. § 57b .....................................................................................................................2

15 U.S.C. § 1601–1666j ...................................................................................................1, 2

15 U.S.C. § 1607(c) ...............................................................................................................2

15 U.S.C. § 1664(a) and (d) ................................................................................................36

15 U.S.C. § 1666 .................................................................................................................34

15 U.S.C. § 1666(a) ............................................................................................................34

15 U.S.C. § 1666(b)(1) ........................................................................................................34

15 U.S.C. §§ 1679–1679*l* .................................................................................................1, 2

15 U.S.C. § 1679a(a)(3) ......................................................................................................10

15 U.S.C. § 1679b(a)(1) ......................................................................................................20

15 U.S.C. § 1679b(a)(3) ......................................................................................................10

15 U.S.C. § 1679b(b) ..........................................................................................................25

15 U.S.C. § 1679c(a) ......................................................................................................23, 24

15 U.S.C. § 1679d(b)(2) ......................................................................................................23

15 U.S.C. § 1679d(b)(4) ................................................................................................23

15 U.S.C. § 1679e(b) ......................................................................................................23

15 U.S.C. § 1679e(c) ......................................................................................................23

15 U.S.C. § 1679h(b) ........................................................................................................2

15 U.S.C. § 1679j ...........................................................................................................27

15 U.S.C. § 1681c-2 .......................................................................................................20

15 U.S.C. § 1693–1693r ...................................................................................................2

15 U.S.C. § 1693e(a) ............................................................................................1, 37, 38

15 U.S.C. § 1693o(c) .........................................................................................................3

15 U.S.C. § 6105(b) ..........................................................................................................2

15 U.S.C. § 7001(c)(1) ...................................................................................................24

15 U.S.C. § 7001(c)(1)(A) ..............................................................................................25

12 C.F.R. Part 1005........................................................................................................1, 2

12 C.F.R. § 1005.10(b) ...............................................................................................37, 38

12 C.F.R. § 1005.10(b), Supp. I, cmts. 5 and 6 ...............................................................37

12 C.F.R. Part 1026........................................................................................................1, 2

12 C.F.R. § 1026.24(d) ...................................................................................................36

16 C.F.R. Part 310........................................................................................................1, 2

16 C.F.R. § 310.2(cc)......................................................................................................36

16 C.F.R. § 310.3(a)(2)(iii).............................................................................................10

16 C.F.R. § 310.4(a)(2)...................................................................................................26

16 C.F.R. § 310.4(a)(9)...................................................................................................36

16 C.F.R. § 310.6(b)(5)...................................................................................................10

Wy. Stat. 17-16-1405(b)(v)...................................................................................4

Fla. Stat. § 607.1405(2)(e) ..................................................................................4

Fla. Stat. § 817.7005(1)......................................................................................27

## MISCELLANEOUS

S. Rep. No. 130, 103rd  Cong., 2d Sess. 15-16, reprinted in 1994 U.S. Code Cong.
& Admin. News 1776 ........................................................................................50

Keith Anderson, *Consumer Fraud in the United States: An FTC Survey* 80 (Aug. 2004),
available at https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-
states-ftc-survey/040805confraudrpt.pdf ..........................................................38

Kenneth Brevoort, Robert Avery & Glenn Canner, *Credit Where None Is Due? Authorized-User
Account Status and Piggybacking Credit*, 47 J. Cons. Affairs 518, 520 (2013)...........................17

## I.     INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), brings this action to halt a pernicious credit repair scheme that has defrauded millions of dollars from consumers nationwide.  Through Internet websites and unsolicited emails and text messages, Defendants promise to substantially improve consumers' credit scores by removing all negative items and hard inquiries from their credit reports or by adding seasoned tradelines to their credit histories.  Despite their promises and the extraction of thousands of dollars in illegal advanced fees, Defendants typically have not been able to raise consumers' credit scores.  In many instances, when victimized consumers complain about the lack of results, Defendants threaten them with legal action for violating anti-disparagement clauses.  Defendants also allow consumers to finance their substantial fees but fail to make critical disclosures.  Finally, Defendants initiate electronic fund transfers from consumers' accounts without proper authorization and unlawfully use remotely created checks. Defendants unlawful activities have caused at least $6.2 million in consumer injury.

Defendants' actions violate Section 5 of the FTC Act, 15 U.S.C. § 45, the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679–1679j, the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f, and its implementing Regulation Z, 12 C.F.R. Part 1026, and the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a) and its implementing Regulation E, 12 C.F.R. Part 1005.

To put an immediate stop to Defendants' illegal conduct, the FTC seeks, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), an *ex parte* temporary restraining order ("TRO") with an order to show cause why a preliminary injunction should not issue.  The proposed TRO would enjoin Defendants' illegal practices, freeze their assets, disable their

Internet websites, allow the FTC immediate access to Defendants' business premises to inspect and copy documents, and impose other relief. These measures are necessary to prevent continued consumer injury, dissipation of assets, and the destruction of evidence, thereby preserving this Court's ability to provide effective final relief.

## II.   THE PARTIES

### A.  Federal Trade Commission

Plaintiff FTC is an independent agency of the United States government created by the FTC Act, 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45 (a), which prohibits unfair and deceptive acts or practices in or affecting commerce. In addition, the FTC also enforces the following statutes, rules, and regulations:

- CROA, 15 U.S.C. §§ 1679–1679j, which prohibits untrue or misleading representations relating to credit repair services, requires certain affirmative disclosures, and prohibits the charging of advance fees before such services are fully performed.

- The TSR, 16 C.F.R. Part 310, promulgated by the FTC pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108, which prohibits deceptive and abusive telemarketing acts or practices.

- The CRFA, 15 U.S.C. § 45b, which prohibits provisions in form contracts restricting a consumer's ability to provide reviews about a seller's products, services, or conduct.

- TILA, 15 U.S.C. §§ 1601–1667f, and its implementing Regulation Z, 12 C.F.R. Part 1026, which establishes, among other things, disclosure and calculation requirements for consumer credit transactions and advertisements.

- EFTA, 15 U.S.C. §§ 1693–1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.

Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and specific provisions in the statutes, rules, and regulations listed above[1] authorize the FTC, through its own

---

[1] *See* Section 410(b) of CROA, 15 U.S.C. § 1679h(b), Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), the CRFA, 15 U.S.C. § 45b(d), Section 108(c) of TILA, 15 U.S.C. § 1607(c), and Section 918(c) of EFTA, 15

attorneys, to initiate federal court proceedings to enjoin violations of the FTC Act, CROA, the

TSR, the CRFA, TILA and Regulation Z, and EFTA and Regulation E, and to secure such

equitable relief as may be appropriate, including consumer redress and disgorgement of ill-gotten

gains. *See, e.g., FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365-67 (2d Cir. 2011).

### B. Defendants

Defendants include ten interrelated corporations operating as a common enterprise and

two individuals who manage and run the credit repair scam. The corporate Defendants are:

- **Grand Teton Professionals, LLC** ("Grand Teton"), a Wyoming limited liability company formed on August 15, 2016. (PX18 at 4 Table 1, Att. G at 101-16.) It is also registered as a foreign limited liability company in Connecticut and Florida. (*Id.* Att. G at 93-100.) Grand Teton owns the trademarks for several of Defendants' credit repair "brands," including Deletion Expert, Inquiry Busters, and Top Tradelines. (*Id.* at 6 ¶ 11, Att. L at 136-54.) Defendants use Grand Teton's bank accounts to receive funds from and transfer funds to other Defendant-owned accounts. (*Id.* at 20-21 Table 7.) Analysis of bank records indicates that Defendants use Grand Teton to pay their employees and independent contractors. (*Id.* at 23 ¶ 34.)

- **99th Floor, LLC** ("99th Floor"), a Florida limited liability company formed on October 1, 2013. (*Id.* at 4 Table 1, Att. A at 30-52.) 99th Floor is the owner of several fictitious business names registered in Florida, including Top Tradelines and Credit Card Cash Flow. (*Id.* at 6 ¶ 10, Att. K at 129-34.) Defendants use 99th Floor's bank accounts to receive funds from and transfer funds to other Defendant-owned accounts. (*Id.* at 12-15 Table 5, 20-21 Table 7.) Analysis of bank records indicates that Defendants use 99th Floor to pay their employees and independent contractors. (*Id.* at 23 ¶ 34.)

- **Mait Management Inc.** ("Mait Management"), a New York corporation incorporated on September 30, 2013. (*Id.* at 4 Table 1, Att. H at 118-19.) Defendants used Mait Management to register for a commercial mail receiving agency associated with the credit repair scam. (*Id.* at 7 Table 3, Att. M at 156.) Defendants use Mait Management's bank accounts to receive funds from and transfer funds to other Defendant-owned accounts. (*Id.* at 20-21 Table 7)

- **Demand Dynamics LLC** ("Demand Dynamics"), a Florida limited liability company formed on October 1, 2013. (*Id.* at 4 Table 1, Att. D at 71-82.) Defendants use Demand Dynamics' bank accounts receive funds from and transfer funds to other Defendant-owned accounts. (*Id.* at 12-15 Table 5, 20-21 Table 7.) Analysis of bank records

---

U.S.C. § 1693o(c).

indicates that Defendants use Demand Dynamics to pay their employees and independent contractors. (*Id.* at 23 ¶ 34.)

- **Atomium Corps Inc.** ("Atomium–WY") and **Atomium Corps Inc.** ("Atomium–CO") are Wyoming and Colorado corporations, respectively.[2] (*Id.* at 4 Table 1, Att. B at 54-63, Att. C at 65-69.) Both Atomium entities were incorporated on October 31, 2016. (*Id.*) Defendants use the pair of Atomium companies to process payments from consumers. Atomium–CO maintains several merchant processing accounts to process credit and debit card and ACH payments, with those funds then deposited into bank accounts held by Atomium–WY. (*Id.* at 12-15 Table 5, Att. DD, Att. FF, Att. GG, Att. HH, Att. II, Att. JJ.)

- **Startup Masters NJ Inc.** ("Startup Masters–WY") and **Startup Masters NJ Inc.** ("Startup Masters–NJ") are Wyoming and New Jersey corporations, respectively. (*Id.* at 4 Table 1, Att. I at 121-23, Att. J at 126-27.) Both Startup Masters entities were incorporated on October 17, 2016. (*Id.*) As with the two Atomium entities, Defendants use the pair of Startup Masters companies to process payments from consumers, with Startup Masters–NJ holding the merchant processing accounts and Startup Masters–WY holding the deposit bank accounts. (*Id.* at 12-15 Table 5, Att. DD, Att. EE, Att. GG, Att. JJ.) Startup Masters–WY was administratively dissolved on December 9, 2017 (*id.* at 4 Table 1); however, it still maintains active bank accounts that receive funds from Startup Masters–NJ.[3] (*Id.* at 17-19 Table 6.) Analysis of bank records indicates that Defendants use Startup Masters—WY to pay their employees and independent contractors. (*Id.* at 23 ¶ 34.)

- **First Incorporation Services Inc.** ("First Incorp–WY") and **First Incorporation Services Inc.** ("First Incorp–FL") are Wyoming and Florida corporations, respectively. (*Id.* at 4 Table 1, Att. E at 84-87, Att. F at 89-91.) Both First Incorporation entities were incorporated on October 17, 2016.[4] (*Id.*) As with the Atomium and Startup Masters pairs, Defendants use the First Incorporation companies to process payments from consumers, with First Incorp–FL holding the merchant processing accounts and First Incorp–WY holding the deposit bank accounts. (*Id.* at 12-15 Table 5, Att. DD, Att. EE, Att. GG, Att. HH, Att. II, Att. JJ.) Analysis of bank records indicates that Defendants use First Incorp—WY to pay their employees and independent contractors. (*Id.* at 23 ¶ 34.)

The individual Defendants are:

---

[2] Recently, Defendant Andrade incorporated a Florida version of Atomium Corp. (*Id.* at 5 Table 2.)

[3] Under Wyoming law, dissolution of a corporation does not prevent commencement of a proceeding against the corporation in its corporate name. *See* Wy. Stat. 17-16-1405(b)(v).

[4] *Id.* Both First Incorp entities have been administratively dissolved—First Incorp–WY on December 9, 2017, and First Incorp–FL on September 28, 2018. (*Id.* at 4 Table 1.) As discussed, a dissolved Wyoming corporation can still be sued, and Florida law similarly permits suits against dissolved Florida corporations. *See* Fla. Stat. § 607.1405(2)(e).

- **Douglas Filter**, who is or was the manager and organizer of Grand Teton, a manager, president, and director of 99th Floor and Demand Dynamics, and president of Atomium–WY, Startup Masters–WY, and First Incorp–WY.[5]  (*Id.* at 1 Table 4, Att. A at 47-52, Att. B at 54-63, Att. D at 77-79, Att. E at 84-87, Att. G at 93-116, Att. I at 121-24; PX16 Att. JJ at 146-47 (letter from Grand Teton to consumer signed by Filter as "President").)  Mr. Filter is the signatory on many of Defendants' deposit accounts.  (PX18 at 17-19 Table 6, Att. KK, Att. LL, Att. MM, Att. NN, Att. OO, Att. QQ, Att. SS, Att. TT, Att. UU, Att. VV.)  He is the registrant and billing contact person for many of Defendants' Internet websites and mail drops.  (*Id.* at 7 Table 3, 8 ¶ 13, 9 Table 4, Att. N at 160-62, Att. P at 170-84.)  He is an authorized user for Defendants' account with online notary service, Notarize.  (*Id.* at 8 ¶ 16, Att. O at 164.)  He is also copied on letters from Defendants' attorneys to consumers.  (PX03 Att. D at 28; *see also* PX17 Att. A at 109 (consumer spoke with Filter).)

- **Marcio G. Andrade**, who is or was a manager of Grand Teton, manager and CEO of 99th Floor, president, CEO and sole officer of Mait Management, and a manager, president, and director of Demand Dynamics.[6]  (*Id.* at 4 Table 1, Att. A at 30-52, Att. D at 71-82, Att. G at 100, Att. H at 118-19, Att. AA at 804; PX16 at 20 ¶ 110 (consumer told that Mr. Andrade was "the CEO of the company").)  Mr. Andrade is the signatory on many of Defendants' merchant and deposit accounts.  (PX18 at 12-15 Table 5, 17-19 Table 6, Att. DD, Att. II, Att. JJ, Att. OO, Att. PP, Att. RR, Att. WW.)  He is the contact for Defendants telecommunications services.  (*Id.* at 11 ¶ 24, Att. CC.)  Mr. Andrade pays for Defendants' Internet websites.  (*Id.* at 9 Table 4, Att. P at 170-219.)  He is an authorized user for Defendants' account at Notarize, as well as paying for their services.  (*Id.* at 8 ¶¶ 15-16, Att. O at 164.)  He is the registrant and billing contact person for many of Defendants' mail drops.  (*Id.* at 7 Table 3, Att. M at 158.)  He is also copied on letters from Defendants to consumers.  (PX03 Att. D at 28; PX16 at 20 ¶ 110, Att. D at 37, Att. E at 40, Att. FF at 132.)

Defendants market their credit repair services using several fictitious names, or "brands,"

as they are referred to on their website:

- **Deletion Expert** promises to delete all negative items from consumers' credit reports. (PX18 Att. Q.)

- **Inquiry Busters** promises to delete all hard inquiries from consumers' credit reports. (*Id.* Att. R.)

- **Top Tradelines** promises to post seasoned "tradelines" to consumers' credit history by adding those consumers as authorized users to other individuals' credit accounts.  (*Id.* Att. S.)  Defendants claim these "tradelines" have positive payment history that will

---

[5] Defendant filter is also a principal for several related companies.  (PX18 at 5 Table 2.)

[6] Defendant is also a principal for several related companies.  (PX18 at 5 Table 2.)

reflect on the consumer's credit history and thus raise their credit scores. The individuals to whose accounts these consumers are added as authorized users are not family members and do not otherwise have a close personal relationship with the consumers.

- **Credit Card Cash Flow** is the counterpart to Top Tradelines and solicits individuals with credit cards or lines of credit that have long-standing positive payment histories, offering to pay them to let Defendants add unrelated consumers as authorized users. [7] (*Id.* Att. T.)

The websites for each of these brands link to one another. (*See, e.g., id.* Att. Q at 222, Att. R at 324, Att. S at 460.)

Defendants operate as a common enterprise to perpetuate their credit repair scheme. There is substantial evidence of the entities' intertwinement. Corporate records and other documents show that the various corporate Defendants are commonly owned or managed by individual Defendants Filter and Andrade (PX18 at 4 Table 1), and share common addresses. (*Id.* at 23-25 Table 9.) Bank records demonstrate routine commingling of funds, with regular transfers between the various companies and individuals. (*Id.* at 20-21 Table 7, 22 Table 8.) More importantly, Defendants blur corporate distinctions when interacting with consumers: Defendants' brands and Internet websites are owned by Defendants Grand Teton and 99th Floor (*Id.* at 6 ¶¶ 10-11, 8-9 ¶ 17 and Table 4, Att. K, Att. L, Att. P), but consumers make payments to Defendants Atomium–CO, Startup Masters–NJ, and First Incorporation–FL, with money immediately transferred to Defendants Atomium–WY, Startup Masters–WY, and First Incorporation–WY, respectively. (PX02 at 2 ¶ 7 (consumer debited by Atomium); PX03 at 4 ¶ 12 (credit card charged by Atomium); PX04 at 2 ¶ 5 (checks payable to Startup Masters NJ); PX05 at 3 ¶ 10, Att. E at 26 (bank account debited by Atomium), Att. F at 28 (authorization form

---

[7] Defendants market several other brands as well: (1) Fast Unsecured promises maximum unsecured personal funding at low rates (*id.* Att. U); (2) Corporate Cash Credit promises maximum unsecured corporate funding at low rates (*id.* Att. V); (3) Wholesale Shelf Corporations sells "aged corporations" that Defendants registered in the past (*id.* Att. W); (4) High Risk Ninja promises to help high-risk businesses set up working merchant accounts for payment processing (*id.* Att. X.); and (5) Funding CEO sells a business start-up kit to individuals interested in selling Defendants' products to consumers (*id.* Att. Y).

lists vendor as Grand Teton Professionals); PX11 at 11 ¶ 46 (payment charged to Atomium);

PX16 at 17 ¶ 99, Att. AA at 122, Att. BB at 124; PX17 Att. A at 138, 233; PX18 at 12-15 Table

5 (merchant accounts with 99th Floor, Atomium, Demand Dynamics, First Incorporation, Startup

Masters NJ).)

Defendants represent that they are located at 261 South Main Street, Newtown,

Connecticut on their websites and in consumer correspondence. (PX03 Att. A at 10; PX06 Att.

B at 13; PX07 Att. C at 14; PX10 Att. G at 33; PX14 Att. E at 30; PX18 at 10 ¶ 21.)  That

address, however, is a commercial mail receiving.  (PX18 at 7 Table 3, Att. N at 160-62.)  On

corporate papers, bank statements, and service accounts, Defendants list different addresses,

some of which are mail drops or virtual offices—including several in Florida and New York—

while others appear to be residences titled to persons unrelated to Defendants.  (*Id.* at 7 Table 3,

at 23-25 Table 9, Att. M at 156-58.)  A review of bank records, IP log-in addresses from Internet

service providers and payment processors, phone records, and statements on Mr. Andrade's

personal website shows Defendants likely do not have a central operating physical location in the

United States.  (*Id.* Att. AA at 810, 813, Att. CC at 822-24.)  Instead, their sales force appears to

consist of employees or independent contractors located throughout the United States, Brazil,

and The Philippines; their purported fulfillment office is located in The Philippines; and Mr.

Filter and Mr. Andrade likely work out of their residences.  (*Id.* at 22 ¶ 34, Att. AA at 810, Att.

CC at 822-24; PX09 at 3 ¶ 9 (representative told consumer that Defendants had employees

throughout the world, but consumer thought company was based in Connecticut); PX17 Att. A at

169 (consumer spoke with employees in the Philippines).)

III.     **DEFENDANTS' UNLAWFUL BUSINESS PRACTICES**

Since at least mid-2014, Defendants have deceptively marketed credit repair services online and through telemarketing.  Defendants' unlawful credit repair practices fall into four main categories:  (1) false promises that they will remove negative information from consumers' credit reports and improve consumers' credit scores, in violation of the FTC Act, CROA, and the TSR; (2) advising consumers to mislead credit reporting agencies (through filing false ID theft affidavits) and lenders (through the use of third-party tradelines), in violation of CROA; (3) failure to make required CROA disclosures; and (4) collection of prohibited advance fees for credit repair services, in violation of CROA and the TSR.

In addition to these unlawful credit repair practices, Defendants unlawfully attempt to stifle consumers' posting of negative but truthful reviews about Defendants and from exercising their statutory rights to dispute Defendants' illegal advance fees.  Finally, their financing and billing practices violate the TSR, TILA and Regulation Z, and EFTA and Regulation E.

**A.  Defendants' Unlawful Credit Repair Services Practices**

**1.   Defendants Make False Promises Regarding Their Credit Repair Services**

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce."  15 U.S.C. § 45.  An act or practice is deceptive under Section 5(a) if it involves "[1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3] the representation, omission, or practice is material." *FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (citation omitted); *FTC v. LeanSpa, LLC*, 2015 U.S. Dist. LEXIS 26906, at *27 (D. Conn. Mar. 5, 2015).

A 'material' misrepresentation is one that involves information that is important to consumers, and that is therefore likely to affect a consumer's choice of or conduct regarding a

product. *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008); *see also Kraft, Inc. v FTC*, 970 F.2d 311, 322 (7th Cir. 1992). Express claims are presumed material, and require no extrinsic evidence regarding how a reasonable consumer would have perceived them. *See Bronson Partners,* 564 F. Supp. 2d at 125, 135; *see also FTC v. Instant Response Sys., LLC*, 2015 WL 1650914, at *5 (E.D.N.Y. Apr. 14, 2015). Implied claims also are presumed material if there is evidence that the seller intended to make the claim, *Kraft, Inc.*, 970 F.2d at 322, or if the claims go to the central characteristics of the product or service offered. *In the Matter of Southwest Sunsites, Inc.*, 105 F.T.C. 7, 109 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986).

The FTC need not prove reliance by each consumer misled by Defendants. *See FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014). Instead, "the FTC is entitled to a presumption of consumer reliance upon showing that (1) the defendant made material misrepresentations . . . of a kind usually relied upon by reasonable prudent persons; (2) [that] were widely disseminated; and (3) consumers actually purchased the defendants' products." *Id.*

In considering whether a claim is deceptive, the Court must consider the "overall, net impression" created by the representation. *LeanSpa*, 2015 U.S. Dist. LEXIS 26906, at *30 (citing *FTC v. Stefanchik*, 559, F.3d 924, 928 (9th Cir. 2009)); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("the Court must consider the misrepresentations at issue, by viewing [them] as a whole without emphasizing isolated words or phrases apart from their context"); *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("The entire mosaic should be viewed rather than each tile separately"). Further "[w]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from use of the product." *Bronson Partners*, 564 F. Supp. 2d at 125 (citation omitted). The FTC

need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or were made in bad faith. *See, e.g., Verity Int'l*, 443 F. 3d at 63; *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988).

A representation is also deceptive if the maker of the representation lacks a reasonable basis for the claim. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010). Where the maker lacks adequate substantiation evidence, they necessarily lack any reasonable basis for their claims. *Id.*; *see also Removatron Int'l Corp.*, 884 F.2d at 1498; *FTC v. OMICS Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at *5 (D. Nev. Sep. 29, 2017).

Similarly, Section 404(a)(3) of CROA prohibits credit repair organizations from making or using "any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).[8]  Further, the FTC only needs to show an untrue or misleading statement regarding a credit repair service; the statement need not be designed to induce the consumer's purchase. *FTC v. Gill*, 265 F.3d 944, 955 (9th Cir. 2001); *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1334 (M.D. Fla. 2010).  And Section 310.3(a)(2)(iii) of the TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).[9]

---

[8] Defendants fall under CROA's definition of "credit repair organization," which covers any person who uses any instrumentality of interstate commerce or the mails to offer to provide services, in return for a fee, to improve a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(a)(3).  And they do not fall within any exception in Section 403(3)(B)—they are not a 501(c) non-profit, a creditor assisting a consumer to restructure debts owed by the consumer to the creditor, or a depository institution. *Id.*

[9] Defendants' telemarketing activities—both inbound and outbound calls—are covered by the TSR.  Although Section 310.6(b)(5) of the TSR generally exempts from TSR coverage inbound telemarketing calls in response to general medium advertising, there is an exception to the exemption for inbound calls relating to credit repair services. 16 C.F.R. § 310.6(b)(5).

Here, Defendants' core misrepresentation is that their purported credit repair services will substantially improve consumers' credit scores.  They make this misrepresentation by claiming that they will (a) remove negative information and hard inquiries from consumers' credit reports or profiles even where such information is accurate and not obsolete, and (b) register consumers for "tradelines" that will appear on consumers' credit reports or profiles.

### a.   Defendants Make False Promises about Removing Negative Items and Hard Inquiries to Improve Consumers' Credit Scores

On their websites, in marketing text messages and emails, and during sales calls with consumers, Defendants promise to remove any negative items or hard inquiries[10] from consumers' credit reports, thereby improving dramatically consumers' credit scores. Defendants' credit repair brands - "Deletion Expert" and "Inquiry Busters" – serve to reinforce the guarantee that Defendants can provide the advertised services.  In many cases, however, Defendants have failed to deliver on their promises, and consumers pay hundreds or thousands of dollars without obtaining any of the guaranteed results.

Most consumers learn about Defendants' services by searching the Internet for credit repair companies and clicking on Defendants' websites.  (PX03 at 1 ¶ 2; PX04 at 1 ¶ 3; PX06 at 1 ¶¶ 2, 3; PX07 at 1 ¶ 2; PX08 at 1 ¶ 3; PX11 at 5 ¶ 20, 7 ¶ 30; PX14 at 1 ¶ 4; PX 16 at 2 ¶ 8, 3 ¶ 18, 9 ¶ 51, 16 ¶ 94.)  Some consumers learn about Defendants' services from unsolicited emails and text messages.  (PX05 at 1 ¶ 2.)

Defendants' websites, emails, and text messages promise to remove all negative items and inquiries from consumers' credit files, thereby increasing their credit scores.  (PX03 at 1 ¶ 3;

---

[10] A hard inquiry occurs when a lender or other third party checks a consumer's credit report or score because that consumer has applied for credit.  (PX13 at 2 ¶ 5.)  Hard inquiries from the past year are considered by FICO when calculating a consumer's credit score, but their impact is usually relatively small.  (*Id.*)  A soft inquiry typically occurs when a consumer's credit report or score is pulled without the consumer applying for credit, or when a consumer pulls his or her own credit report or credit score.  (*Id.*)  Soft inquiries do not affect credit scores.  (*Id.*)

PX05 at 1 ¶ 2; PX06 at 1¶ 3; PX07 at 1 ¶ 3; PX08 at 1 ¶ 3; PX11 at 5 ¶ 20; PX14 at 1 ¶ 4; PX16

at 16 ¶ 94.)  For example, Defendants' websites, deletionexpert.com and inquirybusters.com,

claim:

- REMOVE ALL NEGATIVE ITEMS FROM CREDIT REPORT IN 3 TO 6 WEEKS (PX18 Att. Q at 298; *see also* PX16 at 9 ¶ 52.)
- Guaranteed to Remove ALL Negative Items on your Credit  (PX18 Att Q. at 256; *see also* PX05 at 1 ¶ 2; PX16 at 9 ¶ 52.)
- REMOVE ALL QUALIFIED INQUIRIES IN 3 TO 6 WEEKS – 100% SUCCESS RATE GUARANTEED!  (PX18 Att. R at 322; PX03 Att. A at 7; PX14 Att. A at 5.)
- Credit Score Effects: Credit Scores typically go UP by 50 to 250 Points, all else being equal (PX18 Att. Q at 256.)

Defendants' unsolicited texts and emails make similar claims: "We GUARANTEE to delete your

Negative Items in 8 weeks and Hard Inquiries in 6 weeks" (PX05 at 1 ¶ 2, Att. A at 7-8; PX07

Att. A at 8) and "Purchase our Full Credit Sweep, including Inquiry Removal Service for $2,999.

. . Boost your credit scores by 150+ points!" (PX10 at 4 ¶ 17, Att. F at 23-24.)

Defendants bolster their website claims with numerous testimonials from purported

satisfied customers who have successfully used Defendants' credit repair services.  (PX06 at 1 ¶

3; PX14 at 1 ¶ 4; PX16 at 10 ¶ 53; PX18 Att. Q at 296-320, Att. R at 426-56.)  For example, one

consumer testimonial claims that as a result of Deletion Expert's work his credit scores are "back

in the 700s." (PX18 Att. Q at 309.)  Another purported testimonial recounts how Deletion

Expert "began making the credit bureaus remove negative accounts."  (*Id.* at 313.)  A purported

customer claimed, "It took about 4 weeks and all 17 inquiries were gone and my credit scores

went up!  And I ended up with 775 from TransUnion, 780 from Experian and 745 from

Equifax."  (*Id.* Att. Q at 318.)  Another purported testimonial claimed his credit scores went

"from 586 to 676 in 52 Days."  (*Id.* at 439.)  Yet another testimonial claimed "Veronica Raised

her Credit Scores from 599 to 684 in 39 days" and that "Veronica's results are the norm here."

(*Id.* at 454.)  Defendants also include testimonials in their unsolicited emails and text messages, which provide a link to Defendants' websites and a toll-free number for consumers to call for more information.

Defendants reiterate their claims during telephone conversations with consumers.  (PX02 at 1 ¶ 4; PX03 at 1 ¶ 4; PX04 at 1 ¶ 4; PX05 at 1 ¶ 3; PX07 at 1 ¶ 6; PX08 at 1 ¶ 4; PX09 at 1 ¶ 2; PX10 at 3 ¶ 14; PX11 at 5 ¶ 21; PX16 at 2 ¶ 9, 10 ¶¶ 54-55, 13 ¶ 73, 16 ¶ 95; *see also* PX17 at 3 ¶ 10, Att. A at 41.)  For example, consumer James Kocher states that Defendants' representative claimed that his credit score would improve by up to 100 points within four weeks.  (PX02 at 1 ¶ 4.)  Defendants told consumer Jennifer Bauer that Deletion Experts could "remove all negative items from my credit reports within 8 weeks, and that my credit scores would go up to the high 600s within 8 weeks."  (PX07 at 1 ¶ 6; *see also id.* at 1-2 ¶ 7 (telemarketer followed up conversation with email guaranteeing that negative items and inquiries would be removed from credit report within 8 weeks).)  Defendants told Joshua McDonald hard inquiries would be gone within 6 weeks.  (PX03 at 2, 3 ¶¶ 6, 10; *see also* PX11 at 7 ¶ 31 (Defendants would remove negative items within 60 days).)

Defendants claim to remove negative information in one of two ways:  a fast track credit sweep/expedited option and a manual credit repair option.  (PX05 at 4 ¶ 13; PX17 Att. A at 41; PX18 Att. Q at 224, 226.)  The former method involves the consumer filing an identity theft affidavit to remove negative information supposedly resulting from such theft.  (PX05 at 4 ¶ 13; PX16 at 2 ¶ 10; PX18 Att. Q at 224.)  The latter method involves Defendants submitting handwritten dispute letters to the credit bureaus.  (PX02 at 1 ¶ 3; PX03 at 1 ¶ 4; PX04 at 1 ¶ 4; PX05 at 1 ¶ 3; PX06 at 1 ¶ 4; PX07 at 1 ¶ 6; PX08 at 1 ¶ 4; PX18 Att. Q at 226.)  Defendants claim that credit bureaus disregard consumers' typed letters disputing negative information:

> [Consumer bureaus] scan the Dispute Documents, run them through an OCR Scanner to detect all the text in the Document, then analyze the text to try to match the text to one of tens of thousands of prior Dispute Letter Templates they have previously received from other Consumers.  [Then the] System just spits back to the Consumer the information reported by the Creditor and claims the information was 'Verified.'  (PX18 Att. Q at 226.)

By submitting handwritten letters "with a variety of different hand writing styles, and particularly hand-writing that is hard for OCR Scanners to identify," Defendants promise that "the chances of getting a Negative Item removed is increased dramatically."  (*Id.*)  Defendants also claim to dispute each negative item with a dispute letter to the creditor, the credit bureaus, and the FTC.  They claim that:

> [i]n many cases, we will not get a response, which automatically qualifies the negative to be deleted.  In other cases, one or the other target will be the right one to grant our requests and call for the elimination of the negatives.  This 3-Way Dispute method is much more effective than the One-Way or Two-Way Methods used by the vast majority of Credit Repair Companies out there.  (*Id.*)

(*See also* PX02 at 1 ¶ 3 (Defendants' telemarketer claimed that once they submitted a dispute, the credit bureaus would have to validate the negative items or "they would be required to remove them."); PX04 at 1 ¶ 4 (telemarketer said that Defendants would keep sending letters until credit bureaus removed negative information).)

These claims are material.  First, because they are express, they are presumed material. *See Bronson Partners,* 564 F. Supp. 2d at 125, 135.  Even without a presumption, claims regarding a company's ability to raise credit scores by removing negative items or hard inquiries are material because they "involve information that is important to consumers," *id.* at 135, especially when consumers are deciding whether to sign up for the company's credit repair services.

Despite their express guarantees, Defendants generally failed to remove most or any negative items or inquiries from consumers' credit reports.  In numerous instances, after taking

14

hundreds or thousands of dollars from consumers in up-front fees, Defendants stopped corresponding with consumers and blamed them for the lack of results, claiming consumers either did not submit the correct paperwork or needed to give the process more time to work. (PX02 at 2 ¶ 9 (consumer told it would take "multiple rounds" before seeing results); PX03 at 4 ¶ 13; PX04 at 2, 3 ¶¶ 7, 10; PX05 at 4 ¶ 13; PX06 at 2-3 ¶¶ 10, 11; PX08 at 3 ¶¶ 12-14; PX09 at 2 ¶¶ 6-8; PX10 at 4 ¶ 17; PX11 at 6 ¶¶ 25-27; PX14 Att. A at 5; PX16 at 3 ¶¶ 13, 16, 11 ¶ 61, 15 ¶¶ 84-86, 18-20 ¶¶ 106, 111; PX17 Att. A at 20, 24.)  Few consumers report that Defendants removed any negative information or hard inquiries, or that they experienced any significant improvement in their credit scores.  (PX02 at 2, 3 ¶¶ 8, 13 (consumer's credit score decreased and Defendants did not remove any negative items or hard inquiries); PX03 at 5 ¶ 16; PX04 at 4 ¶ 14; PX05 at 3 ¶ 12; PX06 at 3 ¶ 15; PX07 at 5 ¶ 22; PX08 at 3-4 ¶¶ 11, 17; PX10 at 5 ¶ 19 (one negative item removed but credit score increased only by a few points, not the 100 points promised); PX11 at 7 ¶ 28, 9 ¶ 39; PX14 at 2-3 ¶¶ 6, 10, 12, 14; PX16 at 3 ¶¶ 13, 16, 11-12 ¶¶ 60, 68, 15-16 ¶ 91, 22 ¶ 120; *see also* PX17 at 3 ¶ 10, Att. A at 20, 24, 35, 43, 48, 58 (consumers score decreased).)

According to Equifax,[11] no credit repair company can legitimately remove accurate, non-obsolete negative information or hard inquiries form consumers' credit files, and any claims to the contrary are false.  (PX12 at 2 ¶ 7; PX13 at 2, 3-4 ¶¶ 8, 10.)  Nor does Defendants' "Manual Credit Repair" increase the odds of success.  According to Equifax, to be successful, a valid dispute must provide documentation to support the consumer's position that information is inaccurate.  (*Id.* at 3 ¶ 11.)  An unsupported assertion that a consumer is disputing a certain item

---

[11] Equifax, along with TransUnion and Experian, is one of the three nationwide credit reporting agencies in the United States. (PX12 at 1 ¶ 3.)  Margaret Leslie, a Vice President with Equifax, who submitted the declaration marked as PX12, is generally familiar with the operations of TransUnion and Experian and the way they respond to consumer disputes and it is her understanding that the procedures used by them do not vary materially from Equifax's procedures. (*Id.* at 4-5 ¶ 16.)

– whether typed or hand-written – is not sufficient to cause a credit bureau to delete the

information without an attempt to verify the consumer's position.  (*Id.* ¶ 12.)  Because few, if

any, consumers report that they provided specific reasons to Defendants to justify removal of

negative information, based on the FTC's experiences with other credit repair companies,

Defendants likely send non-specific letters disputing all or almost all negative information.  Such

letters, according to Equifax, would not be successful.  (*Id.* ¶ 14.)  In addition, the removal of

hard inquiries older than twelve months would not affect credit scores.  (*Id.* at 2 ¶ 5.)

Moreover, Defendants had no reasonable basis to make the credit repair guarantees

because they did not first obtain personalized information regarding consumers' credit histories.

According to Equifax and Fair Isaac Corporation,[12] no entity can guarantee credit score

improvements in the time frames claimed by Defendants without first reviewing consumers'

credit score and credit history information.  (PX12 at 2 ¶ 8; PX13 at 2 ¶ 7.)

### b.  Defendants Make False Promises about Adding Tradelines to Consumers' Credit Reports to Improve Consumers' Credit Scores

Defendants also make false promises to raise consumers' credit scores by purportedly

adding "tradelines" (or accounts) with lengthy and positive payment histories to consumers'

credit histories.  To achieve this result, Defendants promise to add consumers as "authorized

users" to the credit accounts of other individuals with positive payment histories so that the

payment history would also reflect on the authorized user's credit history.  The authorized users

and the individuals to whose accounts they are purportedly added have no familial or other close

---

[12] Fair Isaac Corporation or FICO is the developer of the proprietary credit scoring models commonly referred to as FICO Scores.  (PX13 at 1 ¶¶ 1-3.)

personal relationship—they are entirely unrelated parties, brought together by Defendants solely for the purpose of artificially inflating authorized users' credit scores.[13]

Defendants charge thousands of dollars for their "credit piggybacking" service, marketed under the brand "Top Tradelines." On their websites and in unsolicited emails and text messages, they claim this service will improve consumers' credit scores:

- Guaranteed to boost credit scores. Guaranteed to post on all 3 credit bureaus (PX18 Att. S at 458, 497; PX04 at 2 ¶ 8, Att. B at 10; PX05 at 1 ¶ 2, Att. A at 9; PX11 Att. H at 47.)
- Permanet Score Improvement! (PX18 Att. S at 459.)

(PX10 at 1, 4 ¶¶ 3, 17, Att. A at 7 (email to consumer claimed 100+ point increase by purchasing tradelines), Att. F at 25 (text messages claiming tradeline packages will "Boost your credit scores by 100+ points!"); PX16 at 3 ¶ 19 (website mentioned adding tradelines could improve credit scores 150-180 points); PX17 Att. A at 207 (text message claiming "BOOST YOUR CREDIT SCORE with a DIAMOND TRADELINE PKG").)

Defendants' Top Tradelines website also features numerous testimonials from purported satisfied customers. (PX11 at 10 ¶ 43; PX18 Att. S at 533-87.) For example, one purported customer stated, "I started off with a 656 Score and after adding 4 Tradelines my Scores went up over 770." (PX18 Att. S at 536.) Another supposed testimonial states "171 Point Increase in 3

---

[13] The use of additional authorized users arose in the 1970s primarily in response to complaints from women who were unable to obtain credit because information about joint accounts held with their husbands was reported in the husband's name alone. Kenneth Brevoort, Robert Avery & Glenn Canner, *Credit Where None Is Due? Authorized-User Account Status and Piggybacking Credit*, 47 J. Cons. Affairs 518, 520 (2013). As a result, the Federal Reserve Board promulgated Regulation B that required equal treatment for the account holder and authorized users who are spouses. Because both spouses are often jointly liable for the debts, both should receive the "benefit or burden" of the credit history. Further, spouses were found to play a significant role in maintaining accounts and, thus, the account's payment history was "as much a product of the user's contribution as that of the obligor." *Id.* Defendants' practices of brokering the sale of tradelines (or "piggybacking" credit) stand in stark contrast to the traditional use of authorized user accounts for spouses (or children, other family members, or even close personal friends) where the consumer has a basis for "vouching" for the credit-worthiness of the person being added as additional authorized user. Outside the family member/close personal relation context (*i.e.*, Defendants' practices), "there is little reason to believe that the account's history conveys any information about the authorized user's creditworthiness." *Id.* at 523.

Weeks for Detarius!" (*Id.* at 547.) Another purported customer claimed her credit score "rose from 611 to 764 in only 42 days with TopTradeslines.com." (*Id.* at 568.) In another testimonial, Defendants claimed "200-Point Credit Score Increase for Ash after buying a Diamond Package for $6,500!" (PX11 Att. H at 47; PX18 Att. S at 539-40.)

Defendants repeat these claims in phone calls with consumers: Defendants told consumer Renee Messiha they would add new tradelines to her credit report and her credit score would increase by over 100 points within 45 days. (PX04 at 1 ¶ 4.) Consumer Diescon Vilarino was told that his credit score would improve approximately 250 points by purchasing a tradeline. (PX16 at 4 ¶ 20; *see also* PX11 at 7 ¶ 31 (Defendants would add tradelines to build consumer's credit score); PX17 at 3 ¶ 10.)[14]

These claims are material. First, because they are express, they are presumed material. *See Bronson Partners,* 564 F. Supp. 2d at 125, 135. Even without a presumption, claims regarding a company's ability to raise credit scores by adding tradelines are material because they "involve information that is important to consumers," *id.* at 135, especially when consumers are deciding whether to sign up for the company's credit repair services.

As with their claims to remove negative information, Defendants have no reasonable basis to promise that tradelines will substantially increase credit scores in a matter of weeks without obtaining any information about consumers' specific credit situations. According to FICO, the addition of seasoned tradelines does not guarantee an increase in a consumer's credit score. (PX13 at 3 ¶ 9.) For instance, if the tradeline incurred a delinquency, or had a high

---

[14] In addition, consumers who call Defendants' representatives to sign up for tradeline services are often directed also to sign up with Defendants' deletion services or vice versa. (PX04 at 1 ¶ 4; PX10 at 3 ¶ 14; PX16 at 16-17 ¶ 96.) For example, when consumer Messiha inquired about purchasing tradelines, Defendants explained that she needed their Deletion Expert services first to clear her credit report. (PX04 at 1 ¶ 4.) Defendants told consumer Oliver Ross that "it would be counterproductive" to add tradelines until all of his negative information had been removed, even though he had already paid $2,200 for the Top Tradelines service. (PX10 at 3 ¶ 14.) They convinced Mr. Ross to spend another $2,000 for Deletion Experts. (*Id.* at 4 ¶ 15.)

utilization ratio, an authorized user's credit score could decrease.  (*Id.*)  Further, even if the addition of tradelines could improve a consumer's credit score, it would take more than the 30 to 60 days promised by Defendants and would depend on each individual consumer's credit profile.  (*Id.*)  In addition, FICO Score 8, released to the marketplace in 2009, substantially reduces any benefit of added tradelines.  (*Id.*)  In short, without a full assessment of the added tradeline and the authorized users' specific credit history, Defendants cannot truthfully guarantee that tradelines will increase credit scores.

But even if the addition of tradelines could improve a consumer's credit score in the promised time frames, in virtually all cases Defendants did not even provide consumers with the tradelines they purchased.  (PX04 at 3, 4 ¶¶ 10, 14; PX08 at 4 ¶ 17; PX10 at 2-3, 5 ¶¶ 11-13, 19, Att. C at 12 (consumer received email saying tradeline was added but when he checked his credit report it was not there); PX11 at 9 ¶ 39; PX16 at 4-6, 9 ¶¶ 22-23, 26, 32, 48; *see also* PX17 at 3 ¶ 10, Att. A at 225, 229, 242, 258.)  In the handful of instances where some tradelines did successfully post, consumers report that the tradelines did not substantially improve their credit histories or credit scores.  (PX11 at 12 ¶ 50; PX16 at 5 ¶ 27 (one tradeline was posted but flagged and deleted by bank shortly thereafter); PX17 Att. A at 247 (consumer's score went down after Defendants added tradeline).)

***

Thus, Defendants' credit repair misrepresentations violate Section 5 of the FTC Act, as alleged in Count I of the Complaint, Section 404(a)(3) of CROA, as alleged in Count VI of the Complaint, and Section 310.3(a)(2)(iii) of the TSR, as alleged in Count XII of the Complaint.

### 2.  Defendants Advise Consumers To Make False Statements

Section 404(a)(1) of CROA prohibits credit repair organizations from "counsel[ing] or advis[ing] any consumer to make any statement, which is untrue or misleading . . . with respect

to any consumer's credit worthiness, credit standing, or credit capacity to (A) any consumer reporting agency or (B) any person (i) who has extended credit to the consumer or (ii) to whom the consumer has applied or is applying for an extension of credit." 15 U.S.C. § 1679b(a)(1). Here, Defendants encourage and advise consumers to make false statements to credit bureaus and creditors in violation of CROA.

### a.   Defendants Advise Consumers To File False ID Theft Affidavits

As discussed above, Defendants offer two methods by which they purportedly remove negative information from consumers' credit histories:  credit sweep/fast track and manual credit repair.  Under the first method, Defendants make use of provisions in the Fair Credit Reporting Act regarding information on a consumer's credit history that resulted from identity theft.[15] Specifically, Defendants claim that consumers may have been victims of identity theft without even realizing it, warning that "Today, an identity theft incident is not necessarily identifiable through major purchases that ring alarms."  (PX18 Att. Q at 224.)  They claim to have "extensive experience in rooting out identity theft damages" using their "proprietary Credit Sweep process" to discover identity theft markers and the "subtle identifiers" of identity theft.  (*Id.*)

Defendants pressure consumers who have enrolled to submit identity theft affidavits, even when consumers expressly state they were not victims.  (PX05 at 4-5 ¶¶ 13, 17, 18; PX14 at 2 ¶ 7, Att. B at 8-18; PX16 at 2 ¶ 10.)  For example, consumer Jack Smith reports he selected the manual credit repair option but that numerous representatives told him repeatedly that he needed to file an identity theft affidavit to complete the program (*id.* at 4 ¶ 13, 5 ¶¶ 17-19, Att. H at 33-39). Mr. Smith wrote, "No..I am not doing this for the 5th time..this is illegal and I did not sigh [sic] up for this..I ASKED FOR THE HAND WRITTEN CHALLENGE LETTERS.  I am not

---

[15] Under Section 605B of the Fair Credit Reporting Act, 15 U.S.C. § 1681c-2, "a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft."

getting involved in thjs [sic] illegal activity. I am not filing a false police report." (*Id.* Att. H at 35.) Despite that, Mr. Smith received an alert from his credit monitoring service that, without his approval, Defendants had claimed he had experienced identity theft. (*Id.* at 4 ¶ 16.) Meanwhile, consumer John Crowe reports that Defendants prepared an identity theft affidavit for him, even though he never mentioned being a victim of identity theft, and told him to sign it and file it with the police. (PX14 at 2 ¶¶ 7, 8, Att. B at 8-18.) He refused. (*Id.* ¶ 8.) Thus, Defendants violate Section 404(a)(1)(A) of CROA, as alleged in Count IV of the Complaint.

### b.  Defendants Advise Consumers To Mislead Creditors

Through their Top Tradelines brand, as discussed above, Defendants offer to have lower-credit consumers added as "authorized users" to the credit accounts of other unrelated individuals with positive payment histories so that the positive payment information would also reflect on the authorized users' credit history and thus improve their credit. Through their Credit Card Cash Flow brand, Defendants also solicit good-credit consumers, offering to pay them to let Defendants add unrelated, lower-credit consumers as authorized users. (PX18 Att. T at 589.)

However, the purported "authorized users" are not, in fact, given access to the underlying credit. They do not receive account numbers or credit cards associated with the accounts, and therefore cannot charge purchases against the tradelines. Indeed, Defendants admit as much, assuring the good-credit consumers:

- Will the Authorized Users receive a Credit Card in the mail?  No, never.  All Authorized User Credit Cards are mailed to the Primary Account Holder (You). (*Id.* at 621.)

- Is there any risk that an authorized user could get access to my credit card account? . . . all the Authorized User Credit Cards are mailed to your Home Address on file with your Bank, it would be impossible for anyone from our Company or any of the Authorized Users to access your Account. (*Id.* at 602.)

Moreover, Defendants encourage the good-credit consumers to "activate each Credit Card and use them for some of your existing Day-to-Day Expenses, such as Gas, Groceries, Online Purchases, etc, in order to show the Bank that the Authorized User Accounts are actually being used." (*Id.*)  Defendants assure consumers, "[I]t is 100% Legal," and that, "Yes, Banks and Credit Card Companies allow you to add Authorized Users on your Credit Card Accounts, and they can be ANYONE, and can be added for ANY REASON." (*Id.* at 629, 637.)

In reality, Defendants are advising consumers (both the good-credit consumers with the tradelines and the lower-credit consumers seeking tradelines) to mislead creditors about the lower-credit consumers' credit worthiness or credit capacity, including by claiming that the lower-credit consumers are legitimate "authorized users" of the good-credit consumers' lines of credit.  (PX08 at 2 ¶ 7 (Defendants' telemarketer explained that Top Tradelines would add seasoned credit cards to consumer's credit account "to make it look like they were your credit cards").)  Unlike situations where a family member or close personal friend allows someone access to their credit (for example, by serving as a guarantor or co-signor), the consumers are not truly "authorized users" on these third-party individuals' credit accounts because they cannot access those accounts.  Thus, Defendants are advising potential Top Tradeline consumers to mislead creditors about their creditworthiness, and advising consumers with good credit to mislead creditors about purported "authorized users" on their accounts.[16]  Thus, Defendants violate Section 404(a)(1)(B) of CROA, as alleged in Count V of the Complaint.

---

[16] Defendants may argue that they relied on a 2007 news article quoting a former FTC press officer that stated, in regards to the practice of credit piggybacking, "'What I've gathered from attorneys here is that it appears to be legal' technically. . . .'However, the agency is not saying that it is legal.'"  This argument fails because a press statement is not a "final agency action" that could bind the FTC.  *See, e.g., Trudeau v. FTC*, 384 F. Supp. 2d 281, 289-90 (D.C. Cir. 2005) (noting that "[n]o court has ever found a press release to be a final agency action under the APA").  In addition, the statement expressly clarifies that the FTC has not deemed the practice to be legal.

### 3. Defendants Fail to Make Required CROA Disclosures and Provide Consumers with CROA-Compliant Contracts

CROA requires credit repair organizations to make specific disclosures and provide consumers with written contracts that comply with the requirements of the statute. CROA's requirements include (1) a written statement using prescribed language regarding "Consumer Credit File Rights Under State and Federal Law" before any contract or agreement is executed, 15 U.S.C. § 1679c(a); (2) a full and detailed description of the services to be performed and an estimate of the date by which the performance of the services will be complete, 15 U.S.C. § 1679d(b)(2); (3) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right." 15 U.S.C. § 1679d(b)(4); (4) a separate "Notice of Cancellation" form, 15 U.S.C. § 1679e(b); and (5) a copy of the completed contract. 15 U.S.C. § 1679e(c).

Here, consumers report that Defendants do not provide them with any of these CROA-mandated documents and disclosures. (PX02 at 2 ¶ 7; PX03 at 3-4 ¶ 11; PX05 Att. F at 28; PX06 at 2 ¶ 7; PX08 at 3 ¶ 10; PX09 at 1 ¶ 4; PX11 at 8 ¶ 34; PX16 at 3 ¶ 15, 11 ¶ 59, 18 ¶ 100.) For example, in some instances, Defendants do not require consumers to sign any documents at all, in complete contravention to Section 1679d. (PX02 at 2 ¶ 7; PX03 at 3-4 ¶ 11; PX06 at 2 ¶ 7; PX08 at 3 ¶ 10; PX09 at 1 ¶ 4; PX11 at 8 ¶ 34.) In instances where Defendants do require consumers to sign forms, these forms are usually no more than authorizations for Defendants to charge consumers' credit or debit cards and do not conform to CROA's requirements for credit repair contracts, such as providing a description of the services to be performed or notifying consumers of their contract cancellation rights. (*See, e.g.*, PX05 Att. F at

28; PX16 at 17 ¶ 98, Att. Z at 120.)  Defendants generally require these forms to be signed via an

online notary platform, Notarize.com, that connects consumers to a notary via online video chat

and allows them to e-sign documents over the Internet.  (PX03 at 2, 3 ¶¶ 7, 9, 11; PX05 at 3 ¶ 11;

PX07 at 3 ¶ 11; PX10 at 2 ¶ 7, Att. B at 10; PX16 at 10 ¶ 58, 13 ¶ 77, 17 ¶ 98; *see generally*

PX15 at 1-4 ¶¶ 3-10.)  Many consumers report never receiving a copy of the documents they

signed, and although Notarize.com makes these documents available on the platform, consumers

must sign in and download copies.  (PX03 at 3 ¶ 11; PX07 at 3-4 ¶¶ 14, 15; PX10 at 2 ¶ 9; PX11

at 6 ¶ 24, 11 ¶ 45; PX15 at 4 ¶ 11; PX16 at 10 ¶ 58.)

In addition, consumers also report they never received a statement regarding their credit

file rights, which must be in written form and provided separately from the contract, or a Notice

of Cancellation form, which must accompany a contract, in duplicate.  (PX02 at 2 ¶ 7; PX03 at

3-4 ¶ 11; PX06 at 2 ¶ 7; PX08 at 3 ¶ 10; PX09 at 1 ¶ 4; PX10 at 2 ¶¶ 8, 9; PX11 at 6 ¶ 24, 8 ¶ 34,

11 ¶ 45; PX16 at 3 ¶ 15, 11 ¶ 59, 18 ¶ 100.)  Instead, Defendants bury these CROA

disclosures in their Internet websites, at the end of a 50-paragraph "Terms of Use" webpage,

separate from the page on which consumers enter their contact information.  (PX18 Att. Q at

289-91; Att. R at 413-15, Att. S at 526-28.)  Nothing on Defendants' homepages or sign-up

pages indicates that consumers should go to the "Terms of Use" page or that that page contains

important CROA disclosures; on the contrary, most paragraphs on that page concern unrelated

topics such as website terms of use, accuracy of information provided by consumers, and

requirements that consumers be over 18 years of age.  (*Id.* Att Q. at 255-61; Att. R at 328-35.)[17]

---

[17] With regards to the credit rights disclosure, Defendants may rely on the E-SIGN Act, which allows the use of
electronic records to make required disclosures, 15 U.S.C. § 7001(c)(1),  to argue that they "make available" the
required disclosures on their "Terms of Use" page.  But the E-SIGN Act distinguishes between statutory
requirements to "provide" and to "make available," and CROA's credit rights disclosure provision (15 U.S.C. §§
1679c) expressly states that credit repair organizations must "provide."  Merely burying disclosures on their

And although on the online sign-up page, consumers are asked to check a box that they have read the Terms of Use and there is a hyperlink to the page, consumers can check the box without clicking on the hyperlink. (*Id.*) Finally, as discussed above, some consumers sign up for Defendants' services as a result of email, text message, or phone solicitations, without interacting with their websites at all. (*See, e.g.*, **PX05** at 1 ¶ 2.)

Thus, Defendants violate Section 405(a) of CROA, as alleged in Count VIII of the Complaint, Sections 406(b)(2) and (4) of CROA, as alleged in Count IX, Section 407(b) of CROA, as alleged in Count X, and Section 407(c) of CROA, as alleged in Count XI.

### 4.   Defendants Illegally Collect Advance Fees for Credit Repair Services

Section 404(b) of CROA prohibits credit repair organizations from "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed." 15 U.S.C. § 1679b(b); *see also Gill*, 265 F.3d. at 956 ("The CRO Act prohibits acceptance of any payment before fully performing all services (even assuming [the defendant] could and did do what he represented he would do)."). Similarly, Section 310.4(a)(2) of the TSR prohibits sellers and telemarketers from "requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until: (a) the time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and (b) the seller has provided the person with documentation in the form of a consumer report from a consumer

---

websites, amongst unrelated terms and without any notice to consumers, does not satisfy the obligation to "provide" as required by CROA. In addition, even if the Court were to equate "provide" with "make available," the E-SIGN Act only allows the use of electronic disclosures where the consumer affirmatively consents after being informed of their right to receive records in non-electronic form. 15 U.S.C. § 7001(c)(1)(A). None of the consumers interviewed by the FTC recalled having given such consent.

reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." 16 C.F.R. § 310.4(a)(2).

Here, Defendants collect illegal advance fees for their credit repair services. For their Deletion Expert and Inquiry Busters services, Defendants typically require consumers to make upfront payments of $1,999, with a combined rate for both services of $2,999 (if purchased at the same time). (PX02 at 1 ¶ 4; PX05 at 1 ¶ 3; PX06 at 1 ¶ 5; PX07 at 1-2 ¶¶ 6, 7; PX08 at 1 ¶ 4; PX09 at 1 ¶ 3; PX10 at 4 ¶ 15; PX11 at 5 ¶ 22, 7 ¶ 31; PX14 at 3 ¶ 12; PX16 at 2-3 ¶¶ 11-12, 17 ¶ 97.) Meanwhile, the cost of Defendants' Top Tradelines service varies depending on the type and number of tradelines purchased, ranging from $349 to almost $8,000. (PX04 at 2 ¶ 5 (consumer paid $2,500 and $1,455 for tradelines and Deletion Expert services); PX08 at 2 ¶ 8 ($2,000); PX10 at 2 ¶ 10 ($2,200); PX11 at 10 ¶ 44; PX16 at 4 ¶ 21 (consumer paid $1,000), Att. A at 24; PX17 Att. A at 24.) In some instances, Defendants' sales representatives agree to lower the price to whatever amount consumers can afford to pay. (PX02 at 1 ¶ 4 (telemarketer said that if consumer paid "that day" the cost would be only $999 payable in three installments of $333 each); PX03 at 2 ¶ 7; PX05 at 1-2 ¶ 3-4 (telemarketer told consumer that owner would reduce the fee to $999 "but that I had to accept it right away, before the owner left"), Att. B at 14; PX07 at 2 ¶ 10; PX08 at 1 ¶ 4; PX14 at 1 ¶ 5; PX16 at 17 ¶ 97.) With respect to all three brands, however, Defendants require consumers either to pay the entire fee upfront or pay in installments. (PX02 at 1-2 ¶¶ 4, 7; PX03 at 4 ¶ 12; PX04 at 2 ¶ 5; PX05 at 3 ¶ 10, Att. E at 26; PX06 at 1 ¶ 5 (consumer told she could pay $300 every two weeks), 2 ¶ 8; PX07 at 3 ¶ 12, Att. B at 11; PX08 at 1 ¶ 4, Att. A at 6; PX10 at 2 ¶ 10; PX11 at 5 ¶ 22 (fee payable in three installments), 7 ¶ 32; PX14 at 1 ¶ 5; PX16 at 2 ¶ 11, 13 ¶ 74.) For example, with respect to the Deletion Expert and Inquiry Busters brands, consumers are required to pay at least 25% of the cost of the service

($499) up front.  Defendants set up payments (either via credit card or ACH withdrawals) at the

time consumers sign up for their credit repair services, and charge consumers' credit cards or

debit their bank accounts the down payment almost immediately before any services have been

provided.  (PX02 at 1-2 ¶¶ 4, 7; PX03 at 4 ¶ 12; PX04 at 2 ¶ 5; PX05 at 3 ¶ 10, Att. E at 26;

PX06 at 2 ¶ 8; PX07 at 3 ¶ 12, Att. B at 11; PX08 at 1 ¶ 4, Att. A at 6; PX10 at 2 ¶ 10; PX11 at 6

¶23, 7 ¶¶ 31-32; PX16 at 10 ¶ 56, 13 ¶ 74, 17 ¶ 99; *see also* PX17 at 3 ¶ 10, Att. A at 9, 24, 35,

41, 58, 225, 229.)

Thus, Defendants violate Section 404(b) of CROA, as alleged in Count VII of the

Complaint, and Section 310.4(a)(2) of the TSR, as alleged in Count XIII of the Complaint.[18]

## B.  Defendants' Unfair and Unlawful Use of Anti-Disparagement and Anti-Chargeback Provisions

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or

practices in or affecting commerce."  An act or practice is unfair under Section 5 of the FTC Act

if it "causes or is likely to cause substantial injury to consumers which is not reasonably

avoidable by consumers themselves and not outweighed by countervailing benefits to consumers

or to competition."  15 U.S.C. § 45(n).  *See also FTC v. Verity Int'l, Ltd.*, 335 F. Supp. 2d 479,

---

[18] Defendants may argue that under Florida law, credit repair organizations may charge advance fees if they have posted a surety bond. Fla. Stat. § 817.7005(1). Defendants appear to be bonded in accordance with Florida law. (PX18 Att. Q at 263-72, Att. R at 392-401, Att. S at 500-09.) Defendants' state law compliance, however, does not excuse them from CROA's requirements. If it is possible to comply with both laws, Defendants must comply with both laws. *See Rannis v. Fair Credit Lawyers, Inc.*, 489 F. Supp. 2d 1110, 1116 (C.D. Cal. 2007) (holding that a state credit repair law exempting lawyers from complying with the state's requirements did not exempt lawyers from complying with CROA). Here, because Florida law only permits but does not *require* Defendants to charge an advance fee, it is not impossible for Defendants to comply with Florida law while also complying with CROA's ban on advance fees. But if compliance with both statutes were impossible, then federal law supersedes state law. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (add to TOC) ("The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'") (quoting U.S. Const. art. VI, cl. 2); *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation omitted) (state law must yield to federal law "where it is impossible for a private party to comply with both state and federal requirements, *or* where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"); *see also* 15 U.S.C. § 1679j (CROA "shall not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with any law of any State except to the extent that such law is inconsistent with any provision of this title, and then only to the extent of the inconsistency").

498 (S.D.N.Y. 2004). The FTC meets the first prong (substantial injury) by establishing, among other things, that consumers were injured by a practice for which they did not bargain. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (citing *FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114, at *29-31 (N.D. Ga. Sep. 30, 1997) and *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1363-66 (11ᵗʰ Cir. 1988)). Injury may be sufficiently substantial if it causes a small harm to a large class of people, *see Neovi*, 604 F.3d at 1157, or severe harm to a limited number of people. *In re Int'l Harvester*, 104 F.T.C. 949, 1064, 1070 (1984). Moreover, the injury is not limited to economic injury. Courts have recognized that emotional impact harm that is substantial and real can satisfy the "substantial injury" prong. *See FTC v. Accusearch Inc.*, 2007 U.S. Dist. LEXIS 74905, at *22-24 (D. Wyo. Sep. 28, 2007) (holding that emotional impact harm caused by invasion of privacy resulting from the defendants' phone record pretexting activities was sufficient).

1.     **Defendants' Anti-Disparagement Provision Is Unfair and Violates the CRFA**

Defendants employ unlawful tactics to undermine consumers' ability to leave negative reviews. Buried within Defendants' form contracts are clauses that ban consumers from disparaging or commenting negatively about Defendants, and state that consumers who violate that ban are subject to $25,000 in liquidated damages.[19]

---

[19] For example, the "Terms of Use" page on Defendants' websites includes the following provisions:

**12. Mutual Non-Disparagement.** You agree and warrant that you shall not disparage or comment negatively, directly or indirectly, about Grand Teton, or its Team. We agree and warrant that we shall not disparage or comment negatively, directly or indirectly about you; except we may reports debts owed by you to us to Credit Reporting Agencies. Disparagement shall be defined as any remarks, comments or statements that impugn the character, honesty, integrity, morality, business acumen or abilities in connection with any aspect of our dealings with each other. You and Grand Teton agree and acknowledge that this non-disparagement provision is a material term of this Agreement; the absence of which would have resulted in Grand Teton refusing to enter into this Agreement.

**20. Liquidated Damages.** In some instances, a breach of these Terms could cause damages, but proving the actual damages would be impossible. These instances shall result in the corresponding liquidated damages, which are a reasonable pre-estimate of the damages:

In some instances, when consumers have left (or threatened to leave) negative reviews of Defendants' services, Defendants have responded by sending cease and desist letters and threatening to file lawsuits.  (PX03 at 4-5 ¶15, Att. D at 27; PX14 at 2 ¶ 9, Att. D at 22; PX16 Att. G at 46-48; *see also* PX17 at 3 ¶ 10.)  For example, shortly after consumer Joshua McDonald filed a complaint with the Consumer Financial Protection Bureau, he received a cease and desist letter from someone purporting to be Defendants' lawyer.  (PX03 at 4-5 ¶ 15, Att. D at 7.)  Meanwhile, after consumer John Crowe posted a review on the website Sitejabber, he received an email from "Samantha Roberts of the Litigation Department of Grand Teton Professionals" threatening him with a $25,000 defamation lawsuit for his negative review. (PX14 at 2 ¶ 9, Att. C at 20, Att. D at 22.)  Consumer Philimina Louis was also threatened with a lawsuit if she "posted any negative information."  (PX16 at 22 ¶ 118, Att. JJ at 147 ("Each time You violate the Non-Disparagement Terms, the liquidated damages will be $25,000, for each violation").)  Consumer Diecson Vilarino received a letter from one of Defendants' purported lawyers stating that

> Under your Contract with TopTradlines.com you are liable to Toptradlines for **liquidated damages in the sum of $5,000 per breach of the non-disclosure provision and $25,000 per breach of the non-disparagement provision**.  Further under Florida law, it is unlawful to engage in defamation of another's character and reputation.

(PX16 Att. G at 46.)

Defendants' anti-disparagement provisions meet all three statutory elements of an unfair practice under Section 5(n).  First, they cause or are likely to cause substantial injury to

---

*   *   *

3. Each time You violate the Non-Disparagement terms, the liquidated damages will be $25,000, for each violation.
4. If You don't pay an amount due within thirty (30) days after we send you a late payment notice, then the liquidated damages will be three times the total amount you were billed but failed to pay.
(PX07 Att. C at 16-17; PX18 Att. Q at 280-83, Att. R at 407, 409, Att. S at 519, 521, Att. U at 686, 688-89, Att. V at 711, 713-14, Att. W at 736, 738-39, Att. Y at 781-82, 784-85; *see also id.*  Att. X at 761.)

consumers by limiting the flow of truthful information to consumers and the marketplace about Defendants' services. Information provided by actual purchasers of a product or service can be important to prospective consumers, especially regarding a negative experience, given that sellers have little interest or incentive in disseminating negative, truthful criticism of themselves. When prior purchasers are gagged, prospective purchasers are deprived of potentially important information about the efficacy of Defendants' credit repair services.[20] Indeed, several consumer declarants report that the lack of negative online reviews influenced their decision to sign up for Defendants' credit repair services. (PX03 at 1 ¶ 3; PX04 at 1 ¶ 3; PX05 at 1 ¶ 2; PX08 at 1 ¶ 3; PX16 at 3 ¶ 18, 10 ¶ 53, 13 ¶ 72, 16 ¶ 94.)

Second, consumers cannot reasonably avoid the harm caused by the anti-disparagement provisions. Prospective consumers reviewing Defendants' credit repair claims would have no way of knowing that previous purchasers' negative reviews are being suppressed through the anti-disparagement clause. "It has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions. . . . Some [sellers] may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons." *Int'l Harvester Co.*, 104 F.T.C. at 1074. Thus, these consumers have no reasonable way to ascertain that negative information is being suppressed, let alone ascertain the content, quality, or quantity of that suppressed information.

Finally, the substantial injury caused by Defendants' anti-disparagement provisions is not outweighed by countervailing benefits to consumers or competition. Unlike nondisclosure provisions that could protect legitimate interests (such as those forbidding disclosure of trade

---

[20] As noted above, the anti-disparagement and anti-chargeback provisions are also contained in the "Terms of Use" for Defendants' other brands, including Corporate Cash Credit (which targets small businesses needing funding) and High Risk Ninja (which targets high-risk businesses needing merchant processing accounts).

secrets or private medical information), Defendants' anti-disparagement clause does not appear to protect any legitimate interest of either Defendants or the consumers "agreeing" to it. Defendants could argue that banning negative reviews would keep prospective customers from being misled by disgruntled customers or false information. There is no reason, however, to believe that these supposed benefits to consumers outweigh the substantial injury the anti-disparagement clause is likely to cause. Indeed, the fact that Congress outlawed the use of such provisions when it enacted the CRFA demonstrates the lack of any benefit to consumers. Thus, Defendants violate Section 5 of the FTC Act, 15 U.S.C. §45, as alleged in Count II of the Complaint.

Defendants' anti-disparagement provisions also violate the CRFA. The Consumer Review Fairness Act of 2016, P.L. 114-258, 15 U.S.C. § 45b, passed by Congress in 2016, renders void any provision of a form contract if such provision (A) prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication or (B) imposes a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication. 15 U.S.C. § 45b(b)(1). Effective March 14, 2017, the CRFA prohibits any person from offering a form contract containing a provision described as void in sub-section (b) of the CRFA. 15 U.S.C. § 45b(c).[21]

Here, Defendants' "Terms of Use" are "form contracts" within the meaning of the CRFA: Defendants use them to market and sell their credit repair and services, and they are imposed on consumers without any meaningful opportunity to negotiate their terms. And the activity the

---

[21] The CRFA defines "covered communication" to mean "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2). The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

provisions seek to prohibit—to "disparage or comment negatively, directly or indirectly, about"

Defendants—is a "covered communication" under the CRFA.  Thus, effective March 14, 2017,

the CRFA "renders void" Defendants' anti-disparagement provisions and they are prohibited

from including such provisions in their contracts.  Accordingly, Defendants violate the CRFA as

alleged in Count XV of the Complaint.

### 2.   Defendants' Anti-Chargeback Provision Is Unfair

Defendants also employ unlawful tactics to undermine consumers' ability to seek

chargebacks of fees paid.  Defendants' form contracts contain buried provisions that discourage

consumers from exercising in a timely fashion their dispute rights under the Fair Credit Billing

Act (sometimes referred to as a "chargeback").[22]  These provisions typically require consumers

to take multiple steps, including attempting to settle the dispute through online mediation and

binding arbitration, before seeking a chargeback.[23]  Notably, according to the American

Arbitration Association's website, a consumer would have to pay fees of at least $250 to initiate

---

[22] As discussed below, under the Fair Credit Billing Act, consumers have only 60 days from the date their credit card statement is transmitted to them to dispute a charge.

[23] For example, the "Terms of Use" page of Defendants' websites include the following provisions:

**15. Payment Dispute Rules.** You warrant that no credit card payment, e-check or other payment made to Grand Teton by you, or a third party for your benefit, shall be disputed, or a chargeback filed with the credit card issuer, and no Claim shall be made against our Surety Bond under any circumstance, until after you have completed sequentially the three step procedure below:

**First:** Attempt first to settle the dispute by online mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. This can be done here: **https://apps.adr.org/webfile/**

**Second:** Submit a claim to be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by a single arbitrator may be entered in any court having jurisdiction thereof. This can be done here: **https://www.adr.org/webfile/faces/home**

**Third:** File a claim against our Surety Bond.
Each time you wish to dispute a payment, these rules must be followed without exception under any circumstance. Each appeal by You, or a third party of a disputed payment decision You or the third party lost counts as a separate disputed payment for purposes of this section 15 and section 20.
(PX18 Att. Q at 281, Att. R at 407-08, Att. S at 520, Att. U at 686-87, Att. V at 711-12, Att. W at 736-37, Att. Y at 782-83; *see also id.* Att Q. at 257-58, Att. R at 331, Att. X at 764.)

online mediation and $925 to initiate online arbitration.  (PX07 at 5-6 ¶24; PX18 Att. BB at 817-19.)  Defendants then threaten liquidated damages of three times the amount of the chargeback for violating these provisions.[24]  In addition, Defendants' "Authorization to Charge Credit Card" includes a confession of judgment "in any court of competent jurisdiction" for "the original amount charged, plus the liquidated damages, along with any and all costs of collection, court costs, and/or reasonable attorneys fees," "without process," and subject "to immediate execution upon such judgment."  (PX05 Att. F at 28; PX16 Att. Z at 120.)

In some instances, when consumers have sought a chargeback when Defendants failed to perform as promised, Defendants have responded by sending cease and desist letters and threatening to file lawsuits.  (PX16 at 5-6 ¶¶ 27-30; Att. G at 46-48, Att. I at 55-56, Att. O at 75-77; *see also* PX17 at 3 ¶ 10.)  For example, after consumer Diecson Vilarino told Defendants he intended to seek a chargeback, he received a letter from one of Defendants' purported lawyers warning that

---

[24] For example, the "Terms of Use" page of Defendants' websites include the following provisions:
**20. Liquidated Damages.** In some instances, a breach of these Terms could cause damages, but proving the actual damages would be impossible. These instances shall result in the corresponding liquidated damages, which are a reasonable pre-estimate of the damages:

1. Each time You violate the Payment Dispute Rules, the liquidated damages will be three times the amount of each of your disputed payment(s) to us, but not less than $1,000.

*   *   *

4. If You don't pay an amount due within thirty (30) days after we send you a late payment notice, then the liquidated damages will be three times the total amount you were billed but failed to pay.
5. If You attempt to pay your balance due, by an altered or fictitious payment instrument, the liquidated damages will be three times the amount of the balance due.

(PX18 Att. Q at 283, Att. R at 409, Att. S at 521, Att. U at 688-89, Att. V at 713-14, Att. W at 738-39, Att. Y at 784-85; PX07 Att. C at 16-17; *see also id.* at 13 ("If you initiate a Dispute/Chargeback and/or Surety Bond Claim without sequentially completing the three step process above you hereby agree and understand that such action will cause severe damage to our Merchant Processing Relationship and/or Surety Bond Relationship and that 200% of the Full Amount of the Disputed Transaction(s) will become immediately due and payable to us as Liquidate Damages."); PX18 Att. X at 764.)

> Your failure to follow these procedures before submitting a
> Chargeback/Unauthorized charge dispute to your credit card company is a major
> breach of this Contract.  In the Contract you agreed to pay Toptradelines.com
> **liquidated damages equal to 200% of the amount of the charge initiated**.

(PX16 Att. G at 47.)  When he repeated his intention, he received a second letter, repeating the

above language and adding that "Your charge was $1000 so under this provision you would owe

$2000 plus my clients attorney fees if you initiate a charge-back." (*Id.* Att. I at 56*.)*  When Mr.

Vilarino sought a chargeback for Defendants' failure to post a tradeline, he received another

letter from Defendants "Litigation Coordinator," claiming he owed Defendants $2,000 in

liquidated damages "when you initiated a chargeback for the $1,000.00 paid for your tradeline."

(*Id.* Att. O at 76.)  Ultimately, Defendants filed an arbitration claim against Mr. Vilarino for

$74,999. (*Id.* at Att. S at 88.)  The arbitration concluded with neither party being awarded

damages.  (*Id.* at 9 ¶ 47.)

Defendants' use of anti-chargeback provisions meet the statutory requirements for

unfairness.  First, this practice causes or is likely to cause substantial consumer injury by

depriving consumers of their credit card chargeback rights under The Fair Credit Billing Act

("FCBA").  15 U.S.C. § 1666.  This act provides consumers the right to dispute "billing errors"

appearing on their credit card statements within 60 days from the date their credit card statement

is transmitted.[25]  *Id.* § 1666(a).  Defendants' provisions requiring mediation and arbitration

*before* consumers exercise their FCBA rights (and threatening substantial liquidated damages if

they do not) may cause consumers to forgo seeking a chargeback or miss the statutory deadline

to dispute the charge.  The futility of Defendants' payment dispute rules is made more evident by

Defendants' no-refunds policy (PX18 Att. Q at 259, Att. R at 332, Att. S at 512); thus, even if

---

[25] The Fair Credit Billing Act defines "billing errors" to include "a reflection on a statement of goods or services not
accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the
agreement made at the time of a transaction." *Id.* § 1666(b)(1).

consumers complied with Defendants' rules, they would likely not receive a refund. At its core, the anti-chargeback provision seems formulated to send consumers on a dilatory and expensive wild goose chase in order to deny them their statutory rights to dispute charges for services they never received.

Second, consumers cannot reasonably avoid the harm caused by these provisions. As discussed above, the anti-chargeback provisions are buried in their "Terms of Use" and in credit card authorization forms, so that many consumers are unlikely to see it. And even when consumers do see it, they still cannot avoid the injury because, at the time of agreement, they do not know that Defendants' credit repair promises are a sham. Consumers cannot reasonably bargain away their FCBA rights when – as a result of Defendants' deception -- they do not have truthful information regarding the terms of that bargain.

Finally, the substantial injury caused by Defendants' anti-chargeback provisions is not outweighed by countervailing benefits to consumers or competition. The enactment of the FCBA, granting consumers the ability to dispute charges for products and services never provided, demonstrates the lack of any benefit to consumers or competition by denying consumers that ability when dealing with a scam. Thus, Defendants violate Section 5 of the FTC Act, 15 U.S.C. §45, as alleged in Count III of the Complaint.

## C. Defendants' Unlawful Financing and Billing Practices

Defendants engage in four unlawful financing and billing practices: (1) using remotely created checks, (2) failing to provide required disclosures in advertisements to finance the fees, and (3) failing to obtain consumers' written authorization for recurring electronic fund transfers.

### 1.   Defendants' Unlawful Use of Remotely Created Checks

Section 310.4(a)(9) of the TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9).  A remotely created payment order includes a remotely created check.  16 C.F.R. § 310.2(cc).

Here, Defendants have created or caused to be created remotely created checks as payment for their credit repair services.  (*See, e.g.,* PX04 Att. A at 6-7; PX18 Att. XX at 1273-1335.)  And, as discussed above, Defendants engage in telemarketing to market these services.  Thus, Defendants violate Section 310.4(a)(9) of the TSR, as alleged in Count XIV of the Complaint.

### 2.   Defendants Fail to Disclose Annual Percentage Rate

Under Section 144(a) and (d) of TILA, 15 U.S.C. § 1664(a) and (d), and Section 1026.24(d) of Regulation Z, 12 C.F.R. § 1026.24(d), if any advertisement for closed-end credit states the amount or percentage of the downpayment, the number of payments or period of repayment, the amount of any payment, or the amount of any finance charge, then the advertisement clearly and conspicuously shall state all of the following: the amount or percentage of the downpayment, the terms of repayment, and the annual percentage rate.

For their Deletion Expert and Inquiry Busters brands, Defendants provide consumers the option to pay the entire amount upfront, or pay either 50% or 25% down with the remainder plus a finance charge paid over 3 months.  (PX18 at 25 ¶ 36, Att. Q at 256.)  For their Inquiry Busters brand, Defendants have also provided consumers the option to pay either 50% or 25% down with the remainder plus a finance charge paid over 6 months.  (*Id.* at 25 ¶ 36, Att.  .)  In both cases, Defendants do not disclose the annual percentage rate, which, depending on the repayment term

chosen, would be approximately 116% or 126%.  (*Id.* at 26 ¶ 38.)  Thus, Defendants violate TILA and Regulation Z, as alleged in Count XVI of the Complaint.

### 3. Defendants Fail to Obtain Written Authorization for Recurring Electronic Fund Transfers

Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."  And Section 1005.10(b) of Regulation E, 12 C.F.R. §1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."  Further, the CFPB's Official Staff Commentary to Regulation E provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization" and that the "authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable."  12 C.F.R. § 1005.10(b), Supp. I, cmts. 5 and 6.

As discussed above, in numerous instances, Defendants allow consumers to finance the fee for their credit repair services with payments (at various times) stretching over three to six months.  (PX02 at 1 ¶ 4.)  Defendants, however, fail to disclose many of the terms of the financing, including the specific dates when consumers' bank accounts will be debited.  (PX02 Att. A at 5 (Defendants only provided month and year of debit).)  In numerous instances, consumers have provided Defendants with a debit card or bank account information to make these payments over time.  (PX02 at 2 ¶ 7.)  Because these "terms of the preauthorized transfer" are not "clear and readily understandable," consumers' authorizations are not valid.  In addition, Defendants do not provide consumers with copies of any documents, let alone consumers'

written authorization for preauthorized transfers (even if they were valid).  (PX02 Att. A at 5.)

Thus, Defendants violate EFTA and Regulation E, as alleged in Count XVII of the Complaint.[26]

### D.  Consumer Injury

A preliminary review of bank records suggests that Defendants have taken in gross

revenues of at least $6,242,745 between June 2016 and October 2018.  (PX18 at 20 ¶ 31.)[27]

Further, Defendants have generated at least 114 complaints.  (PX17 at 3 ¶ 9.)[28]

## IV.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS

### A.  This Court Has the Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and the

Court to issue, temporary, preliminary, and permanent injunctions.  The second proviso of

Section 13(b), under which this action is brought, states that "the Commission may seek, and

after proper proof, the court may issue, a permanent injunction" against violations of "any

provision of law enforced by the Federal Trade Commission." [29]  15 U.S.C. § 53(b).  "[C]ourts

---

[26] As with the CROA disclosures, Defendants may argue that copies of consumers' authorizations are available on the Notarize.com online platform.  As with the CROA disclosures, however, the E-SIGN Act distinguishes between statutory requirements to "provide" and to "make available."  Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), expressly state that a copy of the authorization for a preauthorized transfer "shall be provided," not "made available" to the consumer.

[27] Although Defendants' credit repair misrepresentations are made predominantly under the Inquiry Busters, Deletion Expert, and Top Tradelines brands, Defendants' other brands also contain the anti-disparagement and anti-chargeback provisions.  As a result, it is appropriate to include gross revenues from all of Defendants' brands in the consumer injury calculation.

[28] These complaints are likely just the tip of the iceberg.  In the FTC's experience, the raw number of complaints actually reported to government and consumer protection agencies represent only a fraction of consumer harm.  *See* Keith Anderson, *Consumer Fraud in the United States: An FTC Survey* 80 (Aug. 2004), *available at* https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-ftc-survey/040805confraudrpt.pdf (FTC Bureau of Economics report noting that only 8.4% of consumer fraud victims complain to an "official source" such as the federal government or the BBB).

[29] This action is not brought pursuant to the first proviso of Section 13(b), which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding.  Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982) (holding that routine fraud cases may be brought under second proviso, without being conditioned on the first

have consistently held that 'the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.'" *Bronson Partners,* 654 F.3d at 365; *LeanSpa*, 2015 U.S. Dist. LEXIS 26906, at *49.  By enabling the courts to use their full range of equitable powers, Congress gave them authority to grant preliminary relief, including a temporary restraining order, preliminary injunction, and asset freeze.  *U.S. Oil & Gas*, 748 F.2d at 1434 ("Congress did not limit the court's powers under the final proviso of §13(b), and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief.").  The Court therefore can order the full range of equitable relief sought and can do so on an *ex parte* basis.  *Id.* at 1432 (authorizing preliminary injunction and asset freeze).[30]

## B. The FTC Meets the Standard for Granting a Government Agency's Request for Preliminary Injunctive Relief

The standard for awarding preliminary relief in actions brought under Section 13(b) is lower than that required for private litigants.  The Second Circuit applies a modified standard where, as here, the applicant is a government agency that is acting under its statutory authority to safeguard the public interest.  *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010); *United States v. Diapulse Corp. of America*, 457 F.2d 25, 27 (2d Cir. 1972) ("[T]he function of a court in deciding whether to issue an injunction authorized by a

proviso requirement that the FTC institute an administrative proceeding); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

[30] Numerous courts in this district and throughout the Second Circuit have granted or affirmed *ex parte* temporary injunctive relief similar to that requested here. *See, e.g., FTC et al. v. Campbell Capital LLC*, Case No. 1:18-cv-01163-LJV-MJR (W.D.N.Y. Oct. 25, 2018), ECF No. 17; FTC *v. Pairsys, Inc.*, Case No. 1:14-cv-01192-TJM-CFH (N.D.N.Y. Sep. 30, 2014), ECF No. 7; *FTC v. Marczak*, Case No. 1:12-cv-07192-PAE (S.D.N.Y. Sep. 25, 2012), ECF No. 15; *FTC et al. v. Leanspa, LLC*, Case No. 3:11-cv-01715-JCH (D. Conn. Nov. 14, 2011), ECF No. 24; *FTC v. Global U.S. Resources*, Case No. 3:10-cv-01457-VLB (D. Conn. Sep. 14, 2010), ECF No. 13; *FTC v. Consumer Health Benefits Assoc.*, Case No. 1:10-cv-03551-ILG (E.D.N.Y. Aug. 3, 2010), ECF No. 1; *FTC v. Int'l Direct, Inc.*, Case No. 3:97-cv-00721-PCD (D. Conn. Apr. 16, 1997), ECF No. 12; *FTC v. Mortgage Service Assoc., Inc.*, Case No. 3:95-cv-01362-AVC (D. Conn. Jul. 13, 1995), ECF No. 13.

statute of the United States to enforce and implement Congressional policy is a different one from that of a court when weighing claims of two private litigants"). The agency is not required to make a showing of irreparable harm; instead there is a "presumption of irreparable harm based on a statutory violation." *City of New* York, 597 F.3d at 120; *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977). Courts consider two factors in determining whether to grant preliminary injunctive relief under Section 13(b): (1) the likelihood of success on the merits and (2) the balance of equities. *FTC v. Crescent Publ'g Group*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001); *FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000).[31]

### 1. The FTC Has Demonstrated Its Likelihood of Success on the Merits

Generally, the FTC meets its burden on the likelihood of success issue if it shows preliminarily, by affidavit or other proof, "that it has a fair and tenable chance of ultimate success on the merits." *United States v. Sun & Sand Imports, Ltd., Inc.*, 725 F.2d 184, 188 (2d Cir. 1984) (*citing FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977)); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991) (FTC need not present evidence to justify a "final determination" that the defendants violated the law); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (FTC need only demonstrate "some chance of probable success on the merits"). Moreover, in considering an application for a TRO or preliminary injunction, "courts are permitted to consider hearsay and otherwise inadmissible evidence." *FTC v. 4 Star Resolution, LLC*, 2015 WL 7431404, at *3 (W.D.N.Y. Nov. 23, 2015) (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010)).

---

[31] Although not required to do so, the FTC also meets the Second Circuit's four-part test for private litigants to obtain injunctive relief. As stated above, irreparable injury exists simply because a federal statute is violated. Further, vulnerable consumers will continue to be injured by Defendants' unlawful credit repair practices. Moreover, the public interest in ensuring the enforcement of federal consumer protection laws is strong. *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011). Without the requested relief, the public will suffer irreparable harm from the continuation of Defendants' scheme and the likely destruction of evidence and dissipation of assets.

As set forth in Section III above, the FTC has presented ample evidence, including Defendants' own websites and advertisements and declarations from Defendants' customers, showing that it is likely to succeed on the merits of its claims that Defendants violated Section 5 of the FTC Act, multiple provisions of CROA and the TSR, the CRFA, TILA and its implementing Regulation Z, and EFTA and its implementing Regulation E.

### 2.  The Equities Weigh in Favor of Granting Injunctive Relief

The public interest in halting Defendants' unlawful conduct, preserving evidence, and preserving assets to provide redress to consumers far outweighs any interest Defendants may have in continuing to operate their fraudulent business.  In balancing the equities, the Court should afford less weight to private hardship concerns where the case implicates public equities. *See Verity Int'l*, 124 F. Supp. 2d at 199; *Crescent Publ'g Group*, 129 F. Supp. 2d at 319.  This principle is highly important in enforcing consumer protection laws. *See Mallett*, 818 F. Supp. 2d at 149.  Moreover, where, as here, a defendant's conduct "reflects systematic wrongdoing rather than a mere incidental violation, it presents strong grounds for the issuance of a preliminary injunction." *SEC v. Prater*, 289 F. Supp. 2d 39, 54 (D. Conn. 2003).

Here, the balance of equities justifies the relief sought.  The evidence demonstrates that the public equities—protection of consumers from Defendants' deceptive and unfair practices, effective enforcement of the law, and the preservation of Defendants' assets for final relief— weigh heavily in favor of granting the requested injunctive relief.  Granting such relief is also necessary because Defendants' conduct indicates that they will likely continue to deceive the public. *Five-Star Auto Club,* 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations."); *SEC v. R.J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 877

41

(S.D. Fla. 1974) (past misconduct suggests likelihood of future violations); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

By contrast, the private equities in this case are not compelling. Defendants "can have no vested interest in a business activity found to be illegal," *Diapulse Corp.*, 457 F.2d at 29, and compliance with the law is hardly an unreasonable burden. *See World Wide Factors*, 882 F.2d at 347 ("there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment"). Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on Defendants. *See, e.g., Nat'l Soc'y of Prof. Eng'rs. v. United States*, 435 U.S. 679, 697 (1978); *see also British Am. Commodity Options Corp.*, 560 F.2d at 143 ("[a] court of equity is under no duty to protect illegitimate profits or advance business which is conducted illegally.

### C. Defendants Are a Common Enterprise and Jointly and Severally Liable for the Law Violations

Where the same individuals transact business through a "maze of interrelated companies," the whole enterprise may be held liable as a joint enterprise. *FTC v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (quoting *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000)). In deciding whether a common enterprise exists, the Second Circuit considers whether "the same individuals were transacting an integrated business through a maze of interrelated companies." *FTC v. Campbell Capital LLC*, 2018 U.S. Dist. LEXIS 186728, at *6 (W.D.N.Y. Oct. 24, 2018) (citing *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964)). Courts consider various factors in determining whether a common enterprise existed, such as: (1) common control, (2) sharing of office space and officers, (3) whether business is transacted through "a maze of interrelated companies," (4)

the commingling of corporate funds, and failure to maintain separation of companies, (5) unified advertising, and (6) any other evidence revealing that no real distinction existed between the corporate defendants. *FTC v. Consumer Health Benefits Ass'n*, 2011 U.S. Dist. LEXIS 92389, at *16 (E.D.N.Y. Aug. 18, 2011). Of these factors, "no one factor is controlling." *Id.* Rather, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch*, 332 F.2d at 746.

As discussed in Section II.B above, Defendants form a classic common enterprise, the touchstone of which is operating through a "maze of interrelated companies" operated by the Individual Defendants. The companies share addresses and ownership, and engage in unified advertising via interconnected websites. The Corporate Defendants routinely commingle funds and transfer funds into the personal accounts of the Individual Defendants. Accordingly, each Defendant can be held liable for the actions of the whole.

## D. The Individual Defendants Are Liable for Injunctive and Equitable Monetary Relief

As the controlling forces behind Defendants' scheme, individual Defendants Filter and Andrade are liable for the law violations committed by the Corporate Defendants. Under the FTC Act, individual defendants may be liable for injunctive relief for corporate acts or practices if they: (1) participated directly in the challenged conduct or (2) had the authority to control it. *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) (citing *FTC v. LeadClick Media,* LLC, 838 F.3d 158, 169 (2d Cir. 2016)). In general, an individual's status as a corporate officer and his or her authority to sign documents on behalf of the corporation gives rise to a presumption of control of a small, closely-held corporation. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997). Even where an individual is not officially designated as an officer, "participation or control in an entity's unlawful activity can be shown by a defendant's

'involvement in business affairs' or 'role in the development of corporate practices.'" *LeanSpa*, 2015 U.S. Dist. LEXIS 26906, at *36; *FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114, at *15 (holding that defendant did not have to be an officer or even an employee to control corporate activities). Bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control. *See FTC v. USA Fin., LLC*, 415 F. App'x. 970, 974-75 (11th Cir. 2011).

An individual may be held liable for monetary redress for corporate practices if he or she had, or should have had, knowledge of the corporate defendant's misrepresentations. *LeadClick Media*, 838 F.3d at 169. The FTC need not establish that "the defendant had actual and explicit knowledge of the particular deception at issue." *Moses*, 913 F.3d at 307. Instead, the FTC need only demonstrate that the defendant had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or had an awareness of a high probability of fraud with an intentional avoidance of the truth. *Id.* (quoting *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017). Participation in corporate affairs is probative of knowledge. *Moses*, 913 F.3d at 309; *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d. 270, 279 (D. Conn. 2013). "[T]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999). When a common enterprise is present, an individual's liability for monetary relief is joint and several with all entities participating in the enterprise. *See FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1213-14 (N.D. Ga. 2008).

Here, as discussed above, individual Defendants Filter and Andrade have authority to control, and knowledge of, Defendants' wrongful acts. As discussed in Section II.B above, they

44

are the principal officers of the Corporate Defendants.  They have signatory authority over the

Corporate Defendants' financial accounts, and the points of contact for Defendants' service

providers.  And they are copied on consumer communications.  Accordingly, individual

Defendants Filter and Andrade are both liable for injunctive and monetary relief.

## V.   THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT

As the evidence has forcefully shown, the FTC is likely to succeed in proving that

Defendants' credit repair activities violate the FTC Act and the other statutes listed in the

Complaint, and that the balance of equities strongly favors the public interest.  Preliminary

injunctive relief is thus justified.

### A.  Conduct Relief

To prevent ongoing consumer injury, the proposed TRO prohibits Defendants from

making future misrepresentations concerning credit repair services, charging advanced fees,

failing to provide CROA-mandated disclosures, using anti-disparagement or anti-chargeback

clauses in their consumer contracts, using remotely create checks, advertising financing without

TILA-mandated disclosures, or debiting consumers' accounts without written authorization.

As discussed above, this Court has broad equitable authority under Section 13(b) of the

FTC Act to grant ancillary relief necessary to accomplish complete justice.  *Bronson Partners*,

654 F.3d at 365.  The requested prohibitions simply order Defendants to comply with the law.

### B.  An Asset Preservation Order and an Accounting of Assets Are Necessary to Preserve the Possibility of Final Effective Relief

When a district court determines that the FTC is likely to prevail in a final determination

on the merits, it has "a duty to ensure that . . . assets . . . [are] available to make restitution to the

injured customers."  *World Travel Vacation Brokers*, 861 F.2d at 1031; *see also FTC v. Ross*,

897 F. Supp. 2d 369, 386 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014)*; FTC v. IAB Marketing*, 746 F.3d 1228, 1234 (11th Cir. 2014).  To help ensure the availability of assets, preserve the status quo, and guard against the dissipation and diversion of assets, this Court may freeze the assets of corporate and individual defendants and require an accounting where, as here, the individual Defendants controlled the deceptive activity and had actual or constructive knowledge of the deceptive nature of the practices. [32]  *See, e.g., FTC v. Strano*, 528 F. App'x 47, 49-52 (2d Cir. 2013) (upholding asset freeze); *Verity Int'l*, 124 F. Supp. 2d at 206 (upholding asset freeze and requiring defendants to "make full and truthful disclosure of their financial conditions").

    This Court has the authority to direct third parties to effectuate the purpose of the TRO. *See, e.g., Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (courts have authority to direct third parties to preserve assets); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130-33 (2d Cir. 2014) (courts have equitable power to impose asset freeze and accounting where plaintiff is pursuing a claim for equitable relief).  Further, the Court can order Defendants' assets to be frozen whether the assets are inside or outside the United States.  *See United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States"). [33]

---

[32] Courts in this District and throughout the Second Circuit have frozen defendants' assets and ordered an accounting in many FTC enforcement actions. *See, e.g., FTC et al. v. Campbell Capital LLC*, Case No. 1:18-cv-01163-LJV-MJR (W.D.N.Y. Oct. 25, 2018), ECF No. 17; *FTC v. Capital Enterprises, Inc.*, Case No. 1:15-cv-08407-ER (S.D.N.Y. Oct. 26, 2015), ECF No. 16; *FTC v. Pairsys, Inc.*, Case No. 1:14-cv-01192-TJM-CFH (N.D.N.Y. Sep. 30, 2014), ECF No. 7; *FTC et al. v. Leanspa, LLC*, Case No. 3:11-cv-01715-JCH (D. Conn. Nov. 14, 2011), ECF No. 24; *FTC v. Global U.S. Resources*, Case No. 3:10-cv-01457-VLB (D. Conn. Sep. 14, 2010), ECF No. 13; *FTC v. Consumer Health Benefits Assoc.*, Case No. 1:10-cv-03551-ILG (E.D.N.Y. Aug. 3, 2010), ECF No. 1; *FTC v. Int'l Direct, Inc.*, Case No. 3:97-cv-00721-PCD (D. Conn. Apr. 16, 1997), ECF No. 12.

[33] The TRO also includes a provision that restrains Defendants from taking any action that may result in the encumbrance or dissipation of foreign assets, including taking any action that would invoke a duress clause.  This provision is important because Defendants may have created offshore asset protection trusts that could frustrate the

Without an asset freeze, the dissipation and misuse of assets is likely. Defendants who have engaged in illegal activities are likely to waste assets prior to resolution of the action. *See SEC v. Manor Nursing Ctrs. Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972). In the FTC's experience, defendants engaged in similar unlawful practices secreted assets upon learning of an impending law enforcement action. (Decl. Pl.'s Counsel) ¶ 9 [filed concurrently herewith].)

Here, Defendants have taken in gross deposits of approximately $6.4 million (PX18 at 20 ¶ 31) through an enterprise permeated by deception and unlawful activity. Moreover, Defendants go to great lengths to hide their base of operations, utilizing multiple trade names and mail-receiving entities as their business addresses. (*Id.* at 6 ¶¶ 10-11, 7 Table 3.) They churn through merchant accounts, which is further indicia of fraud. (*Id.* at 15-16 ¶ 28, 23 ¶ 34.) Further, they constantly shift funds through the various corporate bank accounts (*id.* at 20-21 Table 7), and regularly move money to the Individual Defendants' personal accounts. (*Id.* at 22 Table 8.) Defendants also regularly make funds either untraceable (*e.g., id.* at 22 ¶ 34 (at least $174,000 in cash withdrawals)) or move funds offshore (*e.g., id.* (at least $647,000 in offshore wires, including to Brazil and The Philippines, and at least $102,000 in card purchases in Brazil))). Therefore, an asset freeze is required to preserve the funds derived from Defendants' unlawful activities so that the Court can retain its ability to fashion meaningful final relief. In addition, requiring Defendants to complete and return to the FTC financial statements on the forms attached to the proposed TRO will increase the likelihood of preserving existing assets pending final determination of this matter. *See, e.g., FTC v. D Squared Sols., LLC*, 2003 WL 22881377, at *4 (D. Md. Oct. 30, 2003) (ordering immediate accounting of assets).

---

Court's ability to provide consumer redress. *See Affordable Media*, 179 F.3d at 1239-44.

### C. Temporarily Disabling Websites

An order provision temporarily disabling Defendants' websites and suspending their domain name registrations is necessary to prevent further consumer injury. As discussed above, Defendants operate their unlawful credit repair scheme through a network of deceptive Internet websites. Disabling these websites and suspending their domain name registrations will ensure that Defendants cannot evade compliance with any preliminary relief entered by this Court pending final determination of this matter.

As already discussed, this Court has the authority to direct third parties to effectuate the purpose of the TRO. *Cf. Deckert*, 311 U.S. at 290. Other courts have granted similar relief against defendants who have utilized Internet websites to promote fraud.[34]

### D. Preservation of Records

In addition, the proposed order contains a provision directing Defendants to preserve records, including electronic records, and evidence. It is appropriate to enjoin Defendants charged with deception from destroying evidence, and doing so would place no significant burden on them. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing such orders as "innocuous"). In the FTC's experience, defendants engaged in similarly serious unlawful practices destroyed documents upon learning of an impending law enforcement action. (Decl. Pl.'s Counsel ¶ 10.)

---

[34] *See, e.g., FTC v. Capital Enterprises, Inc.*, Case No. 1:15-cv-08407-ER (S.D.N.Y. Oct. 26, 2015), ECF No. 16; *FTC v. Pairsys, Inc.*, Case No. 1:14-cv-01192-TJM-CFH (N.D.N.Y. Sep. 30, 2014), ECF No. 7; *FTC v. Marczak*, Case No. 1:12-cv-07192-PAE (S.D.N.Y. Sep. 25, 2012), ECF No. 15; *FTC v. PCCare247 Inc.*, Case No. 1:12-cv-07189-PAE (S.D.N.Y. Sep. 25, 2012), ECF No. 13; *FTC v. Zeal IT Solutions Pvt Ltd.*, Case No. 1:12-cv-07188-PAE (S.D.N.Y. Sep. 25, 2012), ECF No. 11; *FTC v. Pecon Software Ltd.*, Case No. 1:12-cv-07186-PAE (S.D.N.Y. Sep. 25, 2012), ECF No. 9.

### E.  Expedited Discovery, Including Immediate Production of Documents

The FTC seeks leave of Court for immediate access to Defendants' business premises, if any, and limited discovery to locate and identify documents and assets.[35] "District courts are authorized to depart from normal discovery procedures and fashion discovery by order to meet particular needs in particular cases." *Campbell Capital, LLC*, 2018 U.S. Dist. LEXIS 186728, at *6.  Federal Rules of Civil Procedure 26(d), 33(a), and 34(b) authorize the Court to alter the standard provisions, including applicable time frames, that govern depositions and production of documents.  This type of discovery order reflects the Court's broad and flexible authority in equity to grant preliminary emergency relief in cases involving the public interest.  *See Porter v. Warner Holding*, 328 U.S. 395, 398 (1946); *Fed. Express Corp. v. Fed. Expresso, Inc.*, 1997 U.S. Dist. LEXIS 19144, at * 6 (N.D.N.Y. Nov. 24, 1997) (holding expedited discovery is contemplated by the Federal Rules); *Benham Jewelry Corp. v. Aron Basha Corp.*, 1997 U.S. Dist. LEXIS 15957, at *58 (S.D.N.Y. July 18, 1997) (courts have broad powers to grant expedited discovery).

### F.  The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to Fashion Meaningful Relief

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies *ex parte* relief without notice.  *See Campbell Capital*, 2018 U.S. Dist. LEXIS 186728, at *5.  Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate

---

[35] The FTC's evidence has not identified any business premises and it appears that Defendants may be operating from private residences, including those of the individual Defendants.  The FTC will not enter private residences; instead, the proposed TRO includes a provision directing Defendants to produce within 24 hours of service of the TRO all documents, including any electronic documents, relating to the marketing and sale of credit repair services and allow the FTC to copy those documents.  Defendants would be precluded from introducing into any proceeding in this case any document not so produced.  Such a provision allows the FTC immediate access to Defendants' documents while preserving any Fourth Amendment rights Defendants may have.  The proposed TRO would also require Defendants to turn over passwords for, and grant access to, all corporate email accounts.

and irreparable injury, loss, or damage will result" if notice is given. *Ex parte* orders are proper in cases where "notice to the defendant would render fruitless the further prosecution of the action." *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979); *see also AT&T Broadband v. Tech Commc'ns.*, 381 F.3d 1309, 1319 (11th Cir. 2004). The court noted in *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987), that given the pervasive deception in the case, "it [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the TRO." Mindful of this problem, courts have regularly granted the FTC's request for *ex parte* temporary restraining orders in Section 13(b) cases.[36]

As discussed above, Defendants' business operations are permeated by, and reliant upon, unlawful practices. The FTC's past experiences have shown that, upon discovery of impending legal action, defendants engaged in fraudulent schemes withdrew funds from bank accounts and destroyed records. (Decl. Pl.'s Counsel ¶¶ 9-10.) Defendants' conduct—including large wire transfers to offshore accounts and to Individual Defendants' accounts—and the nature of Defendants' illegal scheme provide ample evidence that Defendants would likely conceal or dissipate assets and destroy evidence absent *ex parte* relief. Thus, this case fits squarely into the narrow category of situations where *ex parte* relief is appropriate to make possible full and effective final relief.

## VI.    CONCLUSION

For the above reasons, the FTC respectfully requests that this Court issue the attached proposed TRO with asset freeze, expedited discovery, and other equitable relief, and require Defendants to show cause why a preliminary injunction should not issue.

---

[36] *See supra* note 30 and the cases cited therein. Indeed, Congress has looked favorably on the availability of *ex parte* relief under the FTC Act: "Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]. The FTC can go into court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, *reprinted in* 1994 U.S. Code Cong. & Admin. News 1776, 1790-91.

Dated: June 17, 2019

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

GREGORY A. ASHE (Bar No. PHV09777)
IOANA R. GORECKI (Bar No. PHV10094)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2077 (Gorecki)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, igorecki@ftc.gov

JOHN HUGHES (CT 05289)
Assistant United States Attorney
Chief of Civil Division
157 Church Street
New Haven, CT 06510
Telephone: 203-821-3700
Facsimile: 203-773-5373
Email: john.hughes@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION